IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

OSCAR MACIAS; LEONARDO GALLEGOS;
MANUEL DELGADO; HIPOLITO GAONA;
JESUS CANO; UNION DE TRABAJADORES
AGRICOLAS FRONTERIZOS; JOSE ANGEL
ORTIZ, and all those similarly situated,

             Plaintiffs,

vs.                                                              No. CIV 91-0509 JB/WPL

NEW MEXICO DEPARTMENT OF LABOR
and PATRICK BACA, in his individual and
official capacities,

             Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant New Mexico Department of Labor's Motion to Reopen Matter and Amend Stipulation and Agreement of Compromise and Settlement, filed March 21, 2013 (Doc. 105)("Motion to Reopen"); and (ii) the Plaintiffs' Motion to Dismiss Putative Motion to Amend/Correct Settlement Agreement by New Mexico Department of Workforce Solutions, Doc. No. 105, filed April 10, 2013 (Doc. 108)("MTD"). The Court held a hearing on November 7, 2013. The primary issues are: (i) whether the Court has subject-matter jurisdiction to rule on a motion filed pursuant to a term of a settlement agreement, where the underlying federal case was dismissed with prejudice in 1992; (ii) whether the Court should grant the Motion to Reopen pursuant to the stock provisions rule 60(b), rather than the custom provisions of the settlement agreement; (iii) whether the Court would have subject-matter jurisdiction over the substance of the Motion to Reopen if it were re-filed as an

independent action; and (iv) whether the Court has personal jurisdiction over the Plaintiff non-movant *Union de Trabajadores Agricolas Fronterizos* ("UTAF"), where process was recently served solely on the lawyer who represented them in the case twenty years ago.  The Court concludes that it lacks subject-matter jurisdiction to entertain the Motion to Reopen under its terms, because the order of dismissal in the case did not retain jurisdiction over the enforcement of the settlement agreement.  The Court will then style the Motion to Reopen as a motion pursuant to rule 60(b), conclude that it is time-barred and, regardless, satisfies none of the grounds justifying relief under that provision, and deny the Motion to Reopen.  The Court will reserve judgment on whether it would have subject-matter jurisdiction over a future independent cause of action on the settlement agreement, because that question is not presently before the Court; it will, however, briefly outline the findings it would need to make to establish possible diversity jurisdiction over the dispute.  Last, the Court will avoid the issue of personal jurisdiction: it is not necessary to the disposition of the case, which can be resolved on subject-matter jurisdiction; the Court lacks key facts needed to evaluate whether UTAF's putative attorney -- who represented it twenty years ago, but who has little contact with it now -- is a proper service recipient for UTAF under rule 5(b)(1); and, if the parties were to litigate this dispute as a new case, the factual circumstances and legal standards attendant to the personal jurisdiction issue would be so different from those presented here that the Court's holding would be of little practical use to them.  The Court denies the Motion to Reopen, and denies the MTD as moot.  The Court will leave the final judgment and all orders entered in the case intact.

## PROCEDURAL BACKGROUND

The Plaintiffs, Spanish-speaking farmworkers in the El Paso, Texas, and Sunland Park, New Mexico, area, sued the Defendant New Mexico Department of Labor ("NMDOL")[1] in 1991 for alleged failure to pay unemployment benefits as the Social Security Act, 42 U.S.C. § 503(a)(1) requires, and their alleged failure to require employers to report wages and pay unemployment contributions.  See Motion to Reopen ¶ 1, at 1.  Nancy L. Simmons, a lawyer from Texas Rural Legal Aid, Inc. ("TRLA"), represented the lead Plaintiff, UTAF.  See MTD ¶ 2, at 2; id. ¶ 6, at 3.  In 1992, the parties reached a compromise to settle most of the claims[2] in the suit by entering into the Stipulation and Agreement of Compromise and Settlement, filed June 16, 1992, as Exhibit A to the Joint Motion of Dismissal with Prejudice (Doc. 88), available on CM/ECF as Exhibit A to the MTD (Doc. 108-1)("Agreement").  The Agreement disclaims that it "is not a consent decree and is not to be construed as such,"[3] Agreement ¶ 1, at 2, and

---

[1] In the years since the filing and disposition of this case in the early 1990's, the New Mexico Department of Labor was renamed the New Mexico Department of Workforce Solutions.  See Motion to Reopen at 1.  This opinion will refer to the entity as NMDOL, regardless under which title it was functioning at the time of the reference.

[2] The claim the settlement agreement did not address was subsequently resolved by way of summary judgment in favor of the Defendants, which judgment the United States Court of Appeals for the Tenth Circuit affirmed on appeal.  See Judgment Dismissing Case, filed September 21, 1992 (Doc. 97); MTD ¶ 3, at 2; id. at ¶ 5, at 3.  That claim is not relevant to the motions presently before the Court.

[3] At least as of 1990, the Office of the Attorney General of the State of New Mexico had a policy against executing any consent decree that

      A.      commits any state governmental agent or entity to the expenditure of funds that the Legislature has not appropriated for the action in question;

provides that NMDOL must "provide itinerant claims taking services in Sunland Park, New Mexico[, and] . . . acquire within a reasonable time certain equipment for use in the Sunland Park office which will provide this itinerant point of services with on-line access to NMDOL's wage information and benefit history,"  Agreement ¶ 9, at 6.  The Agreement also provided that,

> [s]hould there be a reduction in funding to NMDOL, or other standards imposed on NMDOL by the New Mexico State Legislature, the United States Department of Labor, or other entities that would impact this Stipulation and Agreement of Compromise and Settlement, NMDOL reserves the right to motion the Court for appropriate relief.  Further, if budgetary considerations create a situation where it is no longer administratively feasible to continue to implement the particulars of

---

> B.   commits any state governmental agent or entity to acts or omissions that would have been beyond the court's jurisdiction had the case been litigated;
>
> C.   commits the state governmental agent or entity to promulgate, revise, or amend rules or regulations;
>
> D.   limits discretionary power granted to a state governmental agent or entity in a manner that will inhibit response to changing conditions, the establishment of policy or managerial choices, or the protection of third parties' rights; or
>
> E.   does not limit specifically the decree's duration to a reasonable period.

Hal Stratton, Policy of the New Mexico Attorney General on Consent Decrees, in Office of the Attorney General - State of New Mexico - History, Powers & Responsibility 382, 383-84 (1990).  This aversion to consent decrees was the product of resentment that had built up over federal judicial supervision of the state prison system pursuant to a consent decree executed in Duran v. King, No. CIV 77-0721-JB (D.N.M. 1977).  See Duran v. Carruthers, 678 F. Supp. 839 (D.N.M. 1988)(Burciaga, J.), aff'd, 885 F.2d 1485 (10th Cir. 1989), and 885 F.2d 1492 (10th Cir. 1989).

The policy left room, however, for "departure from these guidelines under special circumstances."   Stratton, supra, at 384 (outlining a special procedure wherein "proposed deviations from the[ ]  guidelines must be submitted to the Attorney General for his approval at least 30 days before the consent decree is to be entered").

- 4 -

> this Stipulation and Agreement of Compromise and Settlement, the NMDOL may
> upon proper motion ask the Court for relief.  The plaintiffs do not intend to waive
> any defenses or arguments they might possess in opposition to any such motions.

Agreement ¶ 15, at 8.  The parties then filed a Joint Motion of Dismissal with Prejudice, filed

June 16, 1992 (Doc. 88), stating that, "upon approval of the Court of the Order of Dismissal with

Prejudice," the Agreement "shall henceforth bind the parties regarding the issues contained in the

Stipulation and Agreement of Compromise and Settlement," id. ¶ 1, at 1.  The Honorable

Howard C. Bratton, United States District Judge, entered an Order of Dismissal with Prejudice,

filed June 22, 1992 (Doc. 89), available on CM/ECF as Exhibit C to the Reply to New Mexico

Department of Labor's Response to Plaintiff's Motion to Dismiss, Doc. No. 108

(Doc. 111-3)("Order"), in which he stated "[t]hat the terms and conditions contained in the

Stipulation and Agreement of Compromise and Settlement are hereby binding upon the parties,"

Order ¶ 2, at 1.

    For over twenty years, NMDOL abided by the Agreement and maintained a physical

office in Sunland Park.  See Motion to Reopen ¶ 22, at 4.  In mid-2012, a representative of

NMDOL contacted Ms. Simmons to ask if she "still represent[s] Oscar Macias, et al.," and, if so,

whether the Plaintiffs would consent to NMDOL exercising the Agreement's contingency

provision and closing its office in Sunland Park.  Electronic Mail Transmission from Jason Dean

to Nancy Simmons at 1-2, filed April 10, 2013 (Doc. 108-2)("Dean Email").  See Motion to

Reopen ¶ 24, at 4.  Ms. Simmons had resigned from TRLA in 1993, after the signing of the

Agreement and the entry of the subsequent Order, but before the resolution of the final claim in

the case, apparently withdrawing her representation at that time.  See MTD ¶¶ 5-6, at 3.

NMDOL contacted Ms. Simmons, rather than another TRLA lawyer, in part because CM/ECF

"apparently automatically changes the address for counsel in a closed case, such that counsel appears in her own name, rather than as an employee of TRLA, as 'lead attorney' for UTAF in this closed case."   MTD ¶ 6, at 3.   Ms. Simmons replied that she "no longer represent[s] Mr. Macias, but [she] do[es] represent *Sin Fronteras*,[4] the representative plaintiff."   Dean Email at 2 (emphasis added).   Ms. Simmons then consulted with UTAF and relayed to NMDOL that "[her] client does not consent to the motion."   Electronic Mail Transmission from Tami Keating to Nancy Simmons, filed April 10, 2013 (Doc. 108-3)("Keating Email").   She also stated that, "[o]nce the motion is filed, [she would] accept a copy of the motion as a courtesy, and [NMDOL is] welcome to list [her] on the certificate of service for the motion, but this should not be deemed acceptance of personal service on [her] client."   Keating Email at 5.

1.      **NMDOL Files the Motion to Reopen.**

NMDOL filed its Motion to Reopen on March 21, 2013; the case was reassigned to the Honorable James O. Browning, United States District Judge.   NMDOL cites several reasons supporting its contention that the Sunland Park office is no longer necessary: (i) "employees may file unemployment claims and certify each week via an online process or telephone," -- a service that was unavailable and unforeseeable at the time of the Agreement -- and, "[i]n fact, the Department maintains a call center whereby claimants and employers may call in with questions between the hours of 8am to 5pm, Monday through Friday," Motion to Reopen ¶¶ 10-11, at 2;

----

[4] *Sin Fronteras* is essentially the same entity as UTAF.   The two names are used interchangeably in the briefing, and the Court will refer to both as UTAF.   See Transcript of Hearing at 50:10-15 (Simmons), taken November 7, 2013 ("*Sin Fronterizos* [sic] . . . is sort of the umbrella nonprofit organization and UTAF is sort of a d/b/a.   I don't know that but I'm not remotely contesting that [UTAF is a] part[y] to this contract and [it] would be [a] part[y] before this Court if the Court proceeds.").

(ii) "[a]s of January 2013, potential claimants and employers are able to utilize a new electronic process to file claims, certify work searches, and file reports," Motion to Reopen ¶ 12, at 3; (iii) Sunland Park is "less than 10 miles away from El Paso, Texas, where there are 13 public libraries -- all of which have computers available to the public with internet access," and "the University of Texas at El Paso[, which] has 30 Wi-Fi locations on campus including the library[,] which stays open until 1am most nights," Motion to Reopen ¶¶ 13-14, at 3; (iv) "in Anthony, New Mexico, less than 20 miles from Sunland Park, NM, there is a public library with computers that have internet access . . . [that] closes at 5pm Monday and Friday, 7pm Tuesday-Thursday . . . [and] is open 9am-3pm on Saturday," Motion to Reopen ¶ 15, at 3; and (v) "in Las Cruces, New Mexico, around 42 miles from Sunland Park," there is

> a workforce connection center office which provides services to both employers and potential claimants . . . , one public library . . . with a computer lab and free Wi-Fi . . . , New Mexico State University . . . , [which] has free Wi-Fi . . . [and] two libraries . . . with internet access available to the public . . . , [and] Doña Ana Community College, . . . [which] has a library with both computers and Wi-Fi access.

Motion to Reopen ¶¶ 16-19, at 3.  NMDOL also asserts that, because of "the current budgetary considerations of the Department, it is no longer administratively feasible to continue to implement the particular requirement to have an office in Sunland Park."  Motion to Reopen ¶ 21, at 4.  NMDOL states that it "pays monthly rent . . . [and] pays two employees to travel to the Sunland Park office for two days every week,"  Motion to Reopen ¶ 22, at 4, and argues that, "because unemployment claimants in the area now have superior options for processing their

claims, and the Office costs a substantial amount of taxpayer money to maintain,"[5] NMDOL "seeks leave to close the Sunland Park office," Motion to Reopen ¶ 23, at 4.

    **2.    Ms. Simmons Files a Motion to Dismiss on UTAF's Behalf.**

    Rather than filing a response to the Motion to Reopen, Ms. Simmons, "via a special entry of appearance exclusively for the purpose of challenging subject-matter jurisdiction and personal jurisdiction," filed an MTD on UTAF's behalf. She did so, because, in her view, "the motion to re-open is, in fact, a new action in the nature of a belated counterclaim or cross-claim or a complaint in intervention," subject to dismissal under rule 12(b) of the Federal Rules of Civil Procedure, and requiring NMDOL to assert independent bases of subject-matter and personal jurisdiction. MTD at 9. See Fed. R. Civ. P. 12(b). She argues that the Court lacks both subject-matter and -- because she contends that she no longer represents UTAF -- personal jurisdiction. See MTD at 5, 7.

    Ms. Simmons cites Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375 (1994), for the proposition that, "once the United States District Court dismisses a lawsuit, the court retains no federal subject-matter jurisdiction over disputes arising from the settlement agreement." MTD at 5-6. She acknowledges that, "[i]n Kokkonen, the Court addressed whether the District Court had jurisdiction to address the alleged breach of the agreement, whereas here the issue is modification of the agreement," but contends the "[t]he broad reach of the Court's reasoning . . . applies just the same to the pending motion to re-open." MTD at 6. She asserts that "there is no indication that the dismissal contemplated continuing federal jurisdiction to

_____

    [5] Although this fact is not included in any party's briefing on the motions, Tami Keating, an attorney for NMDOL, represented to Ms. Simmons in an electronic mail transmission that the office was visited by approximately 32 potential claimants per week. See Keating Email at 5.

monitor the agreement," and that, to the contrary, her "recollection is directly the opposite -- that the State wanted no part of federal judicial oversight of the parties' settlement agreement."  MTD at 6.  She argues that, even if the parties had agreed to continuing federal jurisdiction, it would not matter: "[T]he stipulation of the parties, in the absence of a federal court order adopting the settlement agreement as a federal court order, is not sufficient to confer federal subject-matter jurisdiction on this Court."  MTD at 7.  She argues that, because the Order does not adopt the Agreement's terms, "[w]hether the State now seeks to enforce the settlement agreement through an action for breach, or to modify the agreement to escape what it believes is a too onerous provision, the bottom line is the same -- there is no ancillary jurisdiction over the parties' Common Law contract dispute."  MTD at 6.  She notes that NMDOL can likely never trigger the contingency provision, even in state court, "because proceeding in this Court is a condition precedent to modification, pursuant to the terms of the settlement agreement."  MTD at 7.

Ms. Simmons also argues that the Court lacks personal jurisdiction over UTAF because there was never effective service of the Motion to Reopen -- only she, not UTAF, was served.  See MTD at 7.  She asserts that she withdrew from representation of UTAF twenty years ago, "has not entered an appearance on behalf of UTAF for purpose of defending the motion to re-open, and has not consented to service on counsel in lieu of personal service on Plaintiff."  MTD at 8.  She again argues that NMDOL's putative motion is actually an initial filing -- "somewhat in the nature of a counterclaim or complaint in intervention" -- subject to the same service requirements as any other pleading.  MTD at 8.  See Fed. R. Civ. P. 5.  Regardless of the proper styling of the Motion to Reopen, however, rule 5(a) requires parties to serve any "written motion, except one that may be heard ex parte," and any "written notice, appearance, demand, or offer of

judgment, or any similar paper."  MTD at 8 (quoting Fed. R. Civ. P. 5(a)(1)(D)-(E)).  Although

rule 5(b)(1) permits serving a party by serving the party's attorney, Ms. Simmons asserts that,

"[h]ere, UTAF remains unrepresented," and, thus, personal service must be made pursuant to

rule 5(b)(2).  MTD at 8.  She argues that her

> representation ended when counsel resigned from TRLA, and certainly the
> representation of both TRLA and undersigned counsel ended when the case was
> dismissed and administratively closed.  If the rule were otherwise, any party could
> "re-open" an action, serve counsel who represented the party literally decades
> ago, and proceed to seek a default judgment on the motion to re-open.

MTD at 9.  She last argues that, apart from not complying with the Federal Rules of Civil

Procedure, NMDOL's attempt at service is insufficient to meet the demands of due process.  See

MTD at 10 (citing Varnes v. Local 91, Glass Bottle Blowers Ass'n of U.S. & Can., 674 F.2d

1365 (10th Cir. 1982)).

**3.      NMDOL Files Its Response to the Motion to Dismiss.**

NMDOL filed a response to the MTD.  See New Mexico Department of Labor's

Response to Plaintiff Union de Trabajadores Agricolas Fronterizos' Motion to Dismiss Putative

Motion to Amend/Correct Settlement Agreement by New Mexico Department of Workforce

Solutions, Doc. No. 105, filed April 24, 2013 (Doc. 109)("Response").  It argues that the Court

retained subject-matter jurisdiction over the settlement agreement through its 1992 dismissal

order.  See Response at 3.  It argues that Ms. Simmons' reliance on Kokkonen v. Guardian Life

Insurance Co. of America, 511 U.S. 375 (1994), is misplaced:

> In *Kokkonen*, the trial court had merely entered an order dismissing the suit after
> the parties resolved their issues through a settlement agreement without so much
> as a reference to the settlement agreement in the court's order. . . .  [T]he
> [Supreme] Court specifically outlined situations whereby ancillary jurisdiction
> could have existed if the parties had provided for the court's enforcement of a

dismissal-producing settlement agreement though one of the two following avenues:

> [I]f the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal -- either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order[,] . . . a breach of the agreement would be a breach of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.

Response at 4 (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 380-81).

NMDOL argues that the dismissal in this case "meets both exceptions." Response at 4. It asserts that the Agreement contained a "separate provision retaining jurisdiction," because it contemplated that NMDOL could "'upon motion ask the Court for relief,'" a provision that would be rendered meaningless without the Court's ongoing jurisdiction. Response at 4 (quoting Agreement ¶ 15, at 8). NMDOL also asserts that Judge Bratton adopted the Agreement as a court order by incorporating its terms in the Order. See Response at 6; Order ¶ 2, at 1.

NMDOL's last argument on the subject-matter jurisdiction front is that Ms. Simmons' suggestion that NMDOL will never be able to enforce the contingency provision

> is troubling because it suggests that UTAF induced the Department to enter into a settlement agreement and pay a substantial amount of money in attorney's fees based in part on language in the agreement that it now asserts may be unenforceable. If UTAF negotiated and executed the Stipulation and Agreement in good faith,[6] then it could not have believed at the time that the language

---

[6] The Court is not sure what to make of this argument. NMDOL seems to imply that the Court should impute knowledge of all potential subject-matter jurisdictional limitations onto the parties' contemporary understanding when they signed the Agreement. The logic would then progress as follows: (i) UTAF knew that the NMDOL's right to exercise the contingency provision would be unenforceable unless continuing subject-matter jurisdiction was expressly reserved in the Agreement or in the Order; (ii) it would be bad faith for UTAF to negotiate with NMDOL over a right that UTAF knew would be unenforceable; (iii) the Court should construct the Agreement, like all contracts, presuming the parties' good-faith negotiation; and (iv) the

allowing the Department to bring a motion to seek redress was ineffective or unenforceable.

Response at 6.

NMDOL argues that the unique procedural posture of the case obviates the need to serve UTAF with the Motion to Reopen.  See Response at 6.  It "concedes that if it were seeking an enforceable judgment against UTAF, it would need to effectuate personal service and would need to establish the existence of minimum contacts necessary to assert personal jurisdiction over UTAF," but, because the relief sought by NMDOL "requires no performance on the part of UTAF," due process does not demand that service.  Response at 7.  NMDOL concedes that "UTAF is an interested party" to the Agreement, but that the Court has everything it needs from UTAF, namely, its position on the Motion to Reopen.  Response at 7.  "UTAF has communicated its opposition. . . .  If UTAF wishes to formally oppose the modification the Department seeks, UTAF is on notice and needs to show up to assert its interest."  Response at 7.

NMDOL also implicitly questions Ms. Simmons' assertion that she does not represent UTAF:

> Ms. Simmons has already represented that she has communications with UTAF. She spoke on UTAF's behalf and communicated its position on the [Motion to Reopen, but] refused to provide an address to reach UTAF directly[,] . . . [and] she presumably got UTAF's approval to file the [MTD] in which she asserts legal positions on behalf of UTAF . . . .

Court should, therefore, assume that the parties intended for the Court to retain continuing subject-matter jurisdiction.

Even if the Court accepted that NMDOL -- an agency of the State, the ultimate sophisticated party -- needs to be protected from trickery stemming from the farmworkers' superior knowledge of federal jurisdiction, this argument ignores the timing of the relevant precedent.  Kokkonen v. Guardian Life Insurance Co. of America, the case upon which Ms. Simmons almost exclusively relies for her contention that the Court lacks subject-matter jurisdiction, came out after the signing of the Agreement and the entry of the Order.  See 511 U.S. 375 (1994); MTD passim.

- 12 -

Response at 7 (citing Keating Email at 5, 4); Response at 8 n.2.

NMDOL also "disputes the attempt to characterize its motion as a counterclaim because it seeks 'affirmative relief,'" noting that for relief to be "affirmative," it must be able to be "'maintained independently of the plaintiff's action.'"  Response at 8 (quoting MTD at 8 and Black's Law Dictionary 1317 (8th ed. 2004)).  It argues that it "is not pursuing any action against UTAF that could be brought independently of UTAF's suit"; "UTAF is still the Plaintiff here"; and no new basis of personal jurisdiction need be established.  Response at 8.

### 4.      Ms. Simmons Files a Reply on UTAF's Behalf.

Ms. Simmons filed a reply to the Response on UTAF's behalf, again pursuant to a special entry of appearance.  See Reply to New Mexico Department of Labor's Response to Plaintiff's Motion to Dismiss, Doc. No. 108, filed May 13, 2013 (Doc. 111)("Reply").  She argues that NMDOL's motion actually "makes *two* requests, one to re-open this litigation and a second request to amend the . . . Agreement."  Reply at 2 (emphasis in original).  She concedes that, "as a technical matter, this Court *does* have subject-matter jurisdiction to at least entertain Defendant's motion to re-open this lawsuit within the parameters of the Rule," but notes that "'enforcing a settlement agreement and reopening a case are distinct actions.'"  Reply at 2 (quoting Kingvision Pay-per-View Corp. v. Mardi Gras, Inc., 185 F. Supp. 2d 1340, 1341 (M.D. Ga. 2002)).  Ms. Simmons contends that, although the Court has jurisdiction to hear arguments and decide whether to reopen the case -- as the Court has done, culminating in this Memorandum Opinion and Order -- it lacks jurisdiction to consider the merits of the request to activate the contingency provision of the Agreement.  See Reply at 3.  "Thus as a point of procedure this Court could either dismiss Defendant's motion for lack of federal subject-matter jurisdiction over

- 13 -

the substantive request in [the Motion to Reopen], or deny Defendant's motion for the same

reason."  Reply at 3.  She asserts that

> [t]here is nothing in Paragraph 15 [of the Agreement] . . . that suggests that the
> parties stipulated to this Court's retaining jurisdiction for two decades and
> beyond, for the purpose of overseeing a request for amendment via federal court
> action . . . [, n]or would such a stipulation, if it in fact existed, have any legal
> effect, because this Court controls its own subject-matter jurisdiction; the parties
> may not simply stipulate to continuing federal jurisdiction in their . . . Agreement.
> "Consent of parties cannot give the courts of the United States jurisdiction, but the
> parties may admit the existence of facts which show jurisdiction, and the courts
> may act judicially upon such an admission."

Reply at 3-4 (citation omitted)(quoting Railway Co. v. Ramsey, 89 U.S. 322, 327 (1874)).

Ms. Simmons contends that "the critical document to determine whether this Court

retained federal jurisdiction is the Order," which "neither contains a separate provision retaining

jurisdiction . . . nor . . . incorporate[s] the [Agreement's] terms as part of the Order."  Reply at 4.

Although the Order does state that the Agreement's terms and conditions "are hereby binding

upon the parties," Ms. Simmons characterizes this finding as "far more declaratory than

decretal," arguing that it "falls far short of what is required by *Kokkonen* for continuing federal

court jurisdiction."  Reply at 5 (quoting Order ¶ 2, at 1).

On the personal jurisdiction issue, Ms. Simmons asserts that, when "asked via email . . .

whether she represented Plaintiffs[,] . . . [she] answered the question by distinguishing UTAF

from the individual Plaintiffs . . . [with whom she] has no connection whatsoever . . . , but [that

she] could and was willing to communicate with UTAF."  Reply at 6-7.  She responds to

NMDOL's assertion that she is "'best situated to put UTAF on notice of what the Department is

doing'" by conceding that "[t]his is indeed likely true," but, "[q]uite simply, . . . is not how the

Federal Rules of Civil Procedure work, nor what Due Process demands."  Reply at 7 (quoting

- 14 -

Response at 7).  She asserts that she "has not been authorized to accept service, has no obligation to act for Defendant to serve UTAF with notice of the pending motion, and has not done so.  Nor is [she] obligated to explain or defend to Defendant any aspect of her attorney client relationship."  Reply at 7.

As an alternative argument to her primary argument for dismissal on jurisdictional grounds, Ms. Simmons contends that, if the Court allows the Motion to Reopen to proceed, it should proceed as an independent action, and not as a motion in the 1991 case.  See Reply at 9.  She argues that "UTAF should be permitted to respond to the motion to re-open and amend, including the opportunity to request a scheduling order and discovery."  Reply at 9.  She quotes a prior opinion of the Court for the proposition that

> [i]t is often better, when the facts are not clear or are disputed, to treat the request for relief from judgment as a new case: (i) require payment of the filing fee; (ii) require a complaint; (iii) require an answer; (iv) have a scheduling conference and set pre-trial deadlines; (v) allow discovery; and (vi) have a trial.  To set aside an old judgment on a motion without all of the pretrial safeguards of a trial gives considerable power to the movant, who can shortcut all the requirements of bringing a cause of action.

Reply at 9-10 (quoting Mitchell v. Bd. of Cnty. Comm'rs of Santa Fe, No. CIV 05-1155 JB/LAM, 2011 WL 1330775, at *6-7 (D.N.M. Mar. 31, 2011)(Browning, J.)).

**5.      The Court Holds a Hearing on the Motions.**

The Court conducted a joint hearing on the Motion to Reopen and the MTD.  See Transcript of Hearing at 2:3-6 (Court), taken November 7, 2013 ("Tr.").[7]  NMDOL argued that, because the Agreement "states in paragraph 2 . . . that the obligations of that stipulation or

---

[7] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

- 15 -

settlement do not arise until the Court approves of it[,] . . . it was intended by the parties that it be inextricably linked with the order of dismissal in this case. And I think the joint motion for dismissal echo[e]s that." Tr. at 9:12-18 (Branch). After a back-and-forth with the Court, however, NMDOL suggested that its primary argument was not that the Order expressly retained jurisdiction -- although it declined to concede that argument, see Tr. at 13:13-17 (Court, Branch) -- but that the Order incorporated the Agreement's terms, see Tr. at 14:5-8 (Court, Branch)("So the ball game here is the incorporation side. You might have an additional argument, but the ball game is the incorporation?" "Correct, Your Honor."). NMDOL argued

> that in paragraph 2 of that order of dismissal, with the language that was used that quotes, that the terms and conditions contained in the stipulation and agreement of compromise and settlement are here[]by binding upon the parties[,] that in our opinion is not mere surplusage on the Court's part . . . [, r]ather, we feel that it is a full embodiment of each and every term and condition contained in the settlement agreement, including those provisions and terms that clearly, and I think undeniably contemplate ongoing subject-matter jurisdiction with the Court by allowing plaintiff to seek judicial enforcement and by allowing [NMDOL] to seek relief from some of the obligation of the agreement upon making a proper motion with the Court.

Tr. at 14:9-25 (Branch). The Court responded that "the judge certainly had awareness of the settlement agreement. That's probably indisputable. [But] Scalia said that's not enough, right, just awareness of the settlement agreement . . . ?" Tr. at 15:3-7 (Court). NMDOL agreed, see Tr. at 15:8 (Branch), but contended that by "stating that the terms and conditions of the settlement agreement are hereby binding," the Order "approv[ed]," "not mere[ly] acknowledge[d]," the Agreement's terms. Tr. at 15:22-24 (Branch).

NMDOL then clarified the form of its motion: "We definitely do not feel that this is a 60(b) motion." Tr. at 18:3-4 (Branch)(citing Fed. R. Civ. P. 60(b)). "We are not asking for any relief from the contract based on fraud, inadvertence, or anything of that nature." Tr. at 18:6-8

(Branch).   NMDOL contended that its motion was a unique one, apparently not outlined specifically in the Federal Rules of Civil Procedure but, rather, created by the Agreement.  See Tr. at 18:9-10 (Court, Branch)("What you're saying is, [f]orget 60(b), Judge, it's this motion we agreed to."  "Correct.").   NMDOL noted that in contemplating the motion, the Agreement "also prescribed the procedure that's to be followed for invoking relief under that provision."  Tr. at 14-16 (Branch).  The Court then asked whether rule 60(b) was the only way a court could re-open a closed case, to which NMDOL responded: "[A]ssuming that you're finding that the Kokkonen line of cases doesn't also reserve jurisdiction with the Court[, then] [y]es.  And then there would be an issue of time limits for seeking relief from a judgment under Rule 60(b)."  Tr. 18:21-25 (Branch).

The Court then referenced language in Smith v. Phillips, 881 F.2d 902, 904 (10th Cir. 1989), stating that the case

> says we agree with the 7th Circuit that . . . an unconditional dismissal terminates federal jurisdiction, except for the limited purpose of reopening and setting aside the judgment of dismissal with the scope of Rule 60(b).  So it seems to me you've got to use 60(b) to reopen and set aside the judgment.

Tr. at 20:22-21:4 (Court).  NMDOL responded with the contention that the dismissal in this case was not unconditional, because "it was completely conditioned upon the settlement agreement."  Tr. at 21:14-15 (Branch).

Ms. Simmons disagreed, stating that "with all due respect to the Tenth Circuit, the term unconditional order of dismissal is redundant of dismissal with prejudice, where there is not explicit retention of jurisdiction."  Tr. at 23:1-4 (Simmons).  She stated that her recollection of the negotiation was that NMDOL did not want a consent decree, to avoid continuing federal jurisdiction.  See Tr. at 25:17-20 (Simmons).  She also argued that

to construe this sort of mostly boilerplate language [in the Order], saying yes, I approve the agreement and yes, this is fine, you've settled it, great, and dismissed, as being an agreement by the parties and an agreement by Judge Bratton that he is now in charge of how unemployment benefits are administered for farm workers is very much a stretch.

Tr. at 27:23-28:5 (Simmons).

She also conceded that, if the shoe was on the other foot and NMDOL were to simply shut down the Sunland Park office without first obtaining judicial permission, UTAF would likely be unable to bring suit in federal court. See Tr. at 29:2-18 (Simmons). She stated that, if she were to have to argue breach of the Agreement in front of a state court, she "would argue that there is no remedy for reformation because the contract was drafted in a bad way to require some kind of federal motion that cannot lie because there is no jurisdiction." Tr. at 30:12-15 (Simmons). She acknowledged that she did not "know frankly what a state court would do with that. They might say, well, but here's the intent of the parties. I don't know." Tr. at 30:16-18 (Simmons).

Ms. Simmons clarified for the Court that there were six individual Plaintiffs in the case, all of whom had unemployment claims pending, but none of whom were involved in negotiating the Agreement. See Tr. at 31:1-10 (Court, Simmons). She stated that she did not know whether any party to the case, other than UTAF, was a party to the Agreement, but she "would tend to say no, they're not." Tr. at 31:10-11 (Simmons). The Court asked whether UTAF was "[a] New Mexico corporation or nonprofit," Tr. at 32:7-8 (Court), to which Ms. Simmons replied that she was not "sure of their legal designation . . . , but they have an office in El Paso," Tr. at 32:10-11 (Simmons). The Court inquired whether there might be standard diversity jurisdiction over the contract, see Tr. at 32:14-18 (Court), and Ms. Simmons answered that "yes, . . . there may be an

- 18 -

independent basis for federal jurisdiction[, but] that would require a lawsuit.  A new lawsuit.
Because it's still a breach of contract action, not an action within . . . [Case No. CIV] 91-0509,"
Tr. at 32:20-24 (Simmons).

> NMDOL also provided input on the identity and whereabouts of UTAF:
>
> [Counsel] tried searching with the Texas Secretary of State's office.  But that Web
> site was less than helpful.  However, I did see indication that UTAF and its
> successor, which is [ ]now as I believe the center for -- I forget the exact
> verbiage. . . .  But their successor is incorporated as a nonprofit organization in
> Texas.

Tr. at 39:4-11 (Branch).

NMDOL also addressed the personal jurisdiction issue, conceding on the front end that it
"do[es] agree that under Rule 5 of the Rules of Civil Procedure . . . the plaintiffs are definitely
entitled to be served with our motion."  Tr. at 40:23-41:1 (Branch).  But it contended that it
complied with that requirement when it served Ms. Simmons, because "she has told us that she's
their attorney, . . . stat[ing], and I quote, I do represent *Sin Fronterizos*, the representative
plaintiff.  And this was in reference to the current cause of action before [the Court]."  Tr. at
41:4-10 (Branch)(citing Dean Email at 2).  NMDOL also quoted Ms. Simmons as saying: "I
have to ask my client for its consent"; "I believe my client will need to consult its membership";
"I would like until February 20th to consult my client."  Tr. at 42:4-7 (Branch)(quoting Keating
Email at 9, 10).  NMDOL asserted that it "see[s] a pattern here of counsel clearly indicating she
represents the plaintiff," Tr. at 42:7-9 (Branch), and NMDOL is "entitled fully to rely upon that,"
Tr. at 42:22-23 (Branch).  NMDOL further asserted that

> out of an abundance of caution, we chose to make diligent efforts to personally
> serve Mr. Carlos Morentes at *Sin Fronterizos* down in El Paso, and we had the El
> Paso county sheriff's office attempt service multiple times, only to be told by
> Alicia Morentes, who I understand is Mr. Morentes' wife, and who is also

- 19 -

involved in the running of the organization, in fact I've seen her described as . . . director in various Web sites that the organization has.  But the information that the sheriff's office was given was that they do not [ac]cept service there.  Service would need to be made on the organization's power of attorney, who they did not wish to disclose the identity of, nor the address for.  And so . . . document 114, attachment one, Exhibit A is the El Paso county's affidavit of attempt to serve the motion on UTAF . . . , unsuccessfully, . . . [but] we feel that they have actual notice of our motion, and have been served properly with our motion, there[]by conferring on this Court personal jurisdiction as well.

Tr. at 43:10-44:12 (Branch).

NMDOL then argued the substance of the motion -- namely, why it contends that keeping the Sunland Park office open is no longer "administratively feasible" under the meaning of the Agreement; this argument mostly reiterated the points made in the Motion to Reopen, about how technological advances have obviated the need for the office.  Agreement ¶ 15, at 8.  See Tr. 44:24-49:24 (Branch, Court).

Ms. Simmons attempted to clarify her current relationship with UTAF: "I was willing to convey [NMDOL's] request that . . . UTAF simply stipulate to closing . . . the Sunland Park office because I thought there might be another way to manage unemployment . . . that might even be better for UTAF."  Tr. at 50:16-22 (Simmons).  She stated that she

told [Morentes] that they were intending to file a motion. . . .  I don't think I ever sent him a copy of the motion.  But it wasn't filed at the time. . . .  [R]ight now my client does not know there is a pending motion.  I haven't told him because I don't want to open the door to personal service when really I am just entering a special appearance to contest both types of jurisdiction.

Tr. at 50:25-51:4 (Simmons); id. at 51:24-52:4 (Simmons).  She then briefly addressed the merits of NMDOL's request to exercise the contingency provision and close the office, asserting that she has "extensive knowledge of farm workers beginning in 1990, . . . [and that] the old-fashioned way of standing in line is all that will work for farm workers."  Tr. at 52:6-11

- 20 -

(Simmons).   She asserted that "farm workers in El Paso do not possess telephones, do not possess vehicles, do not drive, do not know how to drive, do not speak English[, and] are illiterate," and thus are unsuited to pursuing claims via telephone or the internet.  Tr. at 52:11-14 (Simmons).

The Court then stated its inclination to rule that it lacks subject-matter jurisdiction to reopen the case, because the Order does not incorporate the Agreement, see Tr. at 54:12-55:13 (Court), and adjourned, see Tr. at 55:22-24 (Court).

## LAW REGARDING RULE 60(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 60(b) of the Federal Rules of Civil Procedure allows a court to relieve a party from a judgment or order for "mistake, inadvertence, surprise, or excusable neglect," Fed. R. Civ. P. 60(b)(1), or "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).  "Rule 60(b) is an extraordinary procedure permitting the court that entered judgment to grant relief therefrom upon a showing of good cause within the rule."  Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d 1442, 1444 (10th Cir. 1983).  Rule 60(b) "is not a substitute for appeal, and must be considered with the need for finality of judgment."  Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d at 1444 (citing Brown v. McCormick, 608 F.2d 410, 413 (10th Cir. 1979)).  The rule was designed to strike a "delicate balance" between respecting the finality of judgment and, at the same time, recognizing the court's principal interest of executing justice.  Cessna Fin. Corp. v. Bielenberg Masonry Contracting, Inc., 715 F.2d at 1444.  Once a case is "unconditionally dismiss[ed],"[8] the Court loses all jurisdiction over the case other than the ability

_____

[8] Rule 41(a)(2), which governs all dismissals undertaken by way of a court order, grants courts discretion to condition dismissal "on terms that the court considers proper," Fed. R. Civ. P. 41(a)(2), formerly, "on terms and conditions as the court deems proper," Smith v. Phillips,

to hear motions under rule 60(b).  Smith v. Phillips, 881 F.2d 902, 904 (10th Cir. 1989)("We

agree with the Seventh Circuit that '[a]n unconditional dismissal terminates federal jurisdiction

except for the limited purpose of reopening and setting aside the judgment of dismissal within

the scope allowed by [Fed. R. Civ. P.] 60(b)." (alterations in original)).

---

881 F.2d 902, 904-05 (10th Cir. 1989)(quoting Fed. R. Civ. P. 41(a)(2) (1988)).  Such conditions "could include retention of some jurisdiction by the court."  Smith v. Phillips, 881 F.2d at 905 (citing McCall-Bey v. Franzen, 777 F.2d 1178, 1188-90 (7th Cir. 1985)).  The Tenth Circuit has stated that, if the dismissal is pursuant to rule 40(a)(1)(A)(ii), undertaken without a court order, then the court "is powerless to condition [the] dismissal . . . upon a retention of jurisdiction." 881 F.2d at 905.  This is likely no longer true; the district court can probably attach a condition retaining jurisdiction, but only if the parties agree.

> Even when . . . the dismissal is pursuant to Rule 41(a)(1)(ii) [now rule 41(a)(1)(A)(ii)] (which does not by its terms empower a district court to attach conditions to the parties' stipulation of dismissal) we think the court is authorized to embody the settlement contract in its dismissal order or, what has the same effect, retain jurisdiction over the settlement contract) [sic] if the parties agree.

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381-82.

    The only factors counseling hesitation in endorsing the view that a court may retain jurisdiction of a case dismissed pursuant to rule 41(a)(1)(A) are: (i) the proclamation in Kokkonen v. Guardian Life Insurance Co. of America was dicta, and "[i]t is to the holdings of [the Supreme Court's] cases, rather than their dicta, that we must attend," 511 U.S. 375, 379; and (ii) the Court refers to "embody[ing] the settlement contract in its dismissal order," but rule 41(a)(1)(A) provides -- in its very title -- that it pertains to dismissals effectuated "*Without a Court Order*," Fed. R. Civ. P. 41(a)(1)(A) (emphasis in original).

    Smith v. Phillips must, however, be interpreted in light of the Supreme Court's subsequent decision in Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375 (1994), in which the Supreme Court held that a district court's ancillary jurisdiction does not extend to the post-dismissal enforcement of federal case settlement agreements, unless: (i) there is an independent basis of federal subject-matter jurisdiction to hear the claims; (ii) the court incorporated the terms of the settlement agreement into its order of dismissal; or (iii) the court includes a term "'retaining jurisdiction'" in its order of dismissal.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381.  That decision continues to permit district courts to condition dismissals under rule 41(a)(2), see 511 U.S. at 381, and appears to have no bearing on courts' power to reopen cases pursuant to rule 60(b), see 511 U.S. at 378 (noting, without opining on, the practice of "[s]ome Courts of Appeals" to "reopen[ ] . . . dismissed suit[s] by reason of breach of the agreement that was the basis for dismissal").

Motions to obtain relief from a judgment or order based on "mistake, inadvertence, surprise, or excusable neglect" must be brought "within a reasonable time . . . no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). See Blanchard v. Cortes-Molina, 453 F.3d 40, 44 (1st Cir. 2006)("[R]elief from judgment for reasons of 'mistake, inadvertence, surprise, or excusable neglect,' must be sought within one year of the judgment."). This deadline may not be extended and is not subject to the court's discretion. See Fed. R. Civ. P. 6(b)(2) ("A court must not extend the time to act under Rules 50(b) and (d), 52(b), 59(b), (d), and (e), and 60(b)." (emphasis added)). The pendency of an appeal does not toll the time requirement for pursuing a motion under rule 60(b). See Fed. R. Civ. P. 60(c)(1); Griffin v. Reid, 259 F. App'x 121, 123 (10th Cir. 2007)(unpublished)[9]; Tool Box, Inc. v. Ogden City Corp., 419 F.3d 1084, 1088 (10th Cir. 2005)("[A]n appeal does not toll

---

[9] Griffin v. Reid is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court finds that Griffin v. Reid has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order. The Court makes similar findings in this Memorandum Opinion and Order regarding Argota v. Miller, 424 F. App'x 769 (10th Cir. 2011), McKay v. United States, 207 F. App'x 892 (10th Cir. 2006), Pyeatt v. Does, 19 F. App'x 785 (10th Cir. 2001), United States v. McMahan, 8 F. App'x 272 (10th Cir. 2001), Chavez v. Primus Auto. Fin. Servs., 125 F.3d 861, 1997 WL 634090 (10th Cir. 1997), and Beetle Plastics, Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., 97 F.3d 1464, 1996 WL 531924 (10th Cir. Sept. 19, 1996).

- 23 -

or extend the one-year time limit of Rule 60(b).").  No time limit applies to rule 60(b)(6), other than that the motion be made within a reasonable time.  <u>See</u> Fed. R. Civ. P. 60(c)(1).

### 1.    <u>Rule 60(b)(1).</u>

The Tenth Circuit uses three factors in determining whether a judgment may be set aside in accordance with rule 60(b)(1): (i) whether the moving party's culpable conduct caused the default; (ii) whether the moving party has a meritorious defense; and (iii) whether the nonmoving party will be prejudiced by setting aside the judgment.  <u>See</u> <u>United States v. Timers Preserve</u>, 999 F.2d 452, 454 (10th Cir. 1993).

Under some circumstances, a party can rely on rule 60(b)(1) for a mistake by their attorney or when their attorney acted without their authority.  <u>See</u> <u>Yapp v. Excel Corp.</u>, 186 F.3d 1222, 1231 (10th Cir. 1999)("Rule 60(b)(1) motions premised upon mistake are intended to provide relief to a party . . . when the party has made an excusable litigation mistake or an attorney has acted without authority . . . .").  Mistake in this context entails either acting without the client's consent or making a litigation mistake, such as failing to file or comply with deadlines.  <u>See</u> <u>Yapp v. Excel Corp.</u>, 186 F.3d at 1231.  If the alleged incident entails a mistake, then it must be excusable, meaning that the party was not at fault.  <u>See</u> <u>Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 394 (1993)("This leaves, of course, the Rule's requirement that the party's neglect be 'excusable.'"); <u>Cashner v. Freedom Stores, Inc.</u>, 98 F.3d 572, 577 (10th Cir. 1996)("If the mistake alleged is a party's litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was the result of a deliberate and counseled decision by the party."); <u>Pelican Prod. Corp. v. Marino</u>, 893 F.2d 1143, 1146 (10th Cir. 1990)(holding attorney carelessness is not a basis for relief under Rule 60(b)(1)).

Courts will not grant relief when the mistake of which the movant complains is the result of an attorney's deliberate litigation tactics.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 577. This rule exists because a party

> voluntarily chose [the] attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.

Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. at 397 (quoting Link v. Wabash R.R. Co., 370 U.S. 626, 633-34 (1962))(internal quotation marks omitted).  The Tenth Circuit has held that there is nothing "novel" about "the harshness of penalizing [a client] for his attorney's conduct" and has noted that those "who act through agents are customarily bound," even though, when "an attorney is poorly prepared to cross-examine an expert witness, the client suffers the consequences."  Gripe v. City of Enid, Okla., 312 F.3d 1184, 1189 (10th Cir. 2002). The Court has previously stated:

> There is a tension between how the law treats attorney actions that are without authority, thus permitting relief under rule 60(b), and how the law treats those attorney actions which are inexcusable litigations decisions, thus failing to qualify for relief; although the distinction between those actions may not always be logical, it is well established.

Wilson v. Jara, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at *7 (D.N.M. May 10, 2012)(Browning, J.).[10]

---

[10] The Supreme Court has recognized that individuals must be "held accountable for the acts and omissions of their chosen counsel," and that the "proper focus is upon whether the neglect of respondents and their counsel was excusable."  Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380 (1993)(emphasis in original).  At the same time, the Tenth Circuit has held that, when counsel acts without authority, rule 60(b)(1) provides relief from judgment.  See Cashner v. Freedom Stores, Inc., 98 F.3d at 576 ("[A]s a general proposition, the

'mistake' provision in Rule 60(b)(1) provides for the reconsideration of judgment only where . . . an attorney in the litigation has acted without authority from a party . . . ."). "There is a tension between these decisions, because, ordinarily, a client will not authorize his or her attorney to act in a negligent manner or to make a mistake." Wilson v. Jara, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at *7 n.7. When the client acknowledges that he or she has hired the attorney, there is a difference between decisions which terminate the litigation, such as settlement or a stipulation of dismissal, and other litigation decisions, because decisions to terminate the litigation are ordinarily left to the client. See Chavez v. Primus Auto. Fin. Servs., 125 F.3d 861, 1997 WL 634090, at *4-5 (10th Cir. 1997)(unpublished table decision)(citing Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc., 106 N.M. 705, 707, 749 P.2d 90, 92 (1988); Bolles v. Smith, 92 N.M. 524, 526, 591 P.2d 278, 280 (1979)). "Otherwise the Court has difficulty explaining attorney decisions which are made without authority and attorney decisions for which it is acceptable that the client suffer the consequences." Wilson v. Jara, No. CIV 10-0797 JB/WPL, 2012 WL 1684595, at *7 n.7.

In Chavez v. Primus Automotive Financial Services, the Tenth Circuit recognized that "the mere employment of an attorney does not give him the actual, implied or apparent authority to compromise his client's case." 1997 WL 634090, at *4. Few Tenth Circuit cases analyze whether an attorney has acted without authority. The cases in which the Tenth Circuit has found a lack of authority appear to fall into two categories: (i) cases in which the attorney entered an appearance without the client's knowledge, see FDIC v. Oaklawn Apts., 959 F.2d 170, 175-76 (10th Cir. 1992)(finding that there were factual issues which the district court needed to resolve where "[t]here is nothing in the record indicating when Appellants became aware of the lawsuit and of Newcombe's purported representation"); and (ii) cases in which the attorney's actions terminate the litigation, see Thomas v. Colo. Trust Deed Funds, Inc., 366 F.2d 136, 139-40 (10th Cir. 1966)(finding that, as to one of the plaintiffs, "the record shows that he did not participate in the transactions and negotiations with the S.E.C. and did not consent to the execution of the stipulation of the judgment"); Cashner v. Freedom Stores, Inc., 98 F.3d at 577 (citing with approval Surety Ins. Co. of Cal. v. Williams, 729 F.2d 581, 582-83 (8th Cir. 1984), which held that a "judgment entered upon an agreement by the attorney may be set aside on affirmative proof that the attorney had no right to consent to its entry"). Because decisions that terminate the litigation are ordinarily the client's prerogative, those decisions fit more squarely within rule 60(b)(1)'s "lack of consent" prong.

Decisions where the purported client is unaware of the litigation, or of the attorney's attempt to act on his or her behalf, would also fit within rule 60(b)(1)'s "lack of consent" prong, because an individual has the right to choose his or her own attorney, or to decide whether he or she wishes to have any attorney. Other litigation decisions are made jointly or are within the attorney's control, see Model Code of Prof'l Conduct R. 1.2 cmt. 1 (2011)("With respect to the means by which the client's objectives are to be pursued, the lawyer shall consult with the client . . . and may take such action as is impliedly authorized to carry out the representation."); Pittman ex rel. Sykes v. Franklin, 282 F. App'x 418, 427 n.6 (6th Cir. 2008)(unpublished)("[T]he decision to allege comparative fault as an affirmative defense falls within a narrow band of circumstances in which an attorney may act without consulting his or her client"), and, thus, to give final judgments meaning and allow cases to terminate, it is logical

2.      **Rule 60(b)(6).**

Rule 60(b)(6) provides that a court may relieve a party from final judgment, order, or

proceeding for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  No time limit

applies to rule 60(b)(6), save that the motion be made within a reasonable time.  See Fed. R. Civ.

P. 60(c)(1).  "Thus, to the extent it is applicable, clause (6) appears to offer a means of escape

from the one-year limit that applies to motions under clauses (1), (2), and (3)."  11 Charles Alan

Wright, Arthur R. Miller & M. Kane, Federal Practice & Procedure § 2864, at 490 (2d ed. 2012).

In Pioneer Investment Services Co. v. Brunswick Associates Ltd., 507 U.S. 380 (1993), the

Supreme Court reasoned that, to avoid abrogating the one-year time limit for rule 60(b)(1) to (3),

rule 60(b)' s "provisions are mutually exclusive, and thus a party who failed to take timely action

due to 'excusable neglect' may not seek relief more than a year after the judgment by resorting to

subsection (6)."  507 U.S. at 393 (citing Liljeberg v. Health Services Acquisition Corp., 486 U.S.

---

that those decisions must fall within the "excusable litigation mistake" prong, or be based on a
substantive mistake of law or fact.

    Although the Tenth Circuit does not appear to have expressed its views on where the line
is drawn between attorneys acting without consent and litigation mistakes, or acknowledged the
tension between these two categories, the Court believes that the appropriate division is, when
the client is aware that the attorney is acting on his or her behalf, between decisions which
dispose of the case and ordinarily require client consent, and other routine attorney decisions
which take place over the course of the case.  The Court also notes that rules of professional
conduct require, "[i]n a criminal case," for a lawyer to "abide by the client's decision, after
consultation with the lawyer, as to the plea to be entered, whether to waive a jury trial and
whether the client will testify."  Model Rules of Prof'l Conduct R. 1.2(a).  While a decision on
the plea to be entered in a criminal case is comparable to whether to settle a civil case, the Court
has not located any decisions permitting rule 60(b) relief when a civil attorney waives his or her
client's right to jury trial.  One unpublished decision from the United States Court of Appeals for
the Fourth Circuit discusses briefly a scenario where, without resolving the merits of the issue, a
criminal defendant raised through a rule 60(b) motion in a habeas preceding that "his trial
counsel had prevented him from testifying in his defense."  United States v. McMahan, 8
F. App'x 272, 274 (4th Cir. 2001)(unpublished).

847, 863 & n.11 (1988)).  "If the reasons offered for relief from judgment could be considered under one of the more specific clauses of Rule 60(b)(1)-(5), those reasons will not justify relief under Rule 60(b)(6)."  12 James Wm. Moore et al., Moore's Federal Practice, Civil § 60.48[2], at 60-182 (3d ed. 2013).  Accord Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988)("This logic, of course, extends beyond clause (1) and suggests that clause (6) and clauses (1) through (5) are mutually exclusive.").

Rule 60(b)(6) is a "grand reservoir of equitable power to do justice in a particular case." Van Skiver v. United States, 952 F.2d 1241, 1244 (10th Cir. 1991)(internal quotation marks omitted).  "The Rule does not particularize the factors that justify relief, but we have previously noted that it provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,' while also cautioning that it should only be applied in 'extraordinary circumstances.'"  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. at 863.  Generally, the situation must be one beyond the control of the party requesting relief under rule 60(b)(6) to warrant relief.  See Ackermann v. United States, 340 U.S. 193, 202 (1950)("The comparison [of prior precedent] strikingly points up the difference between no choice and choice; imprisonment and freedom of action; no trial and trial; no counsel and counsel; no chance for negligence and inexcusable negligence.  Subsection 6 of Rule 60(b) has no application to the situation of petitioner.").  Legal error that provides a basis for relief under rule 60(b)(6) must be extraordinary, as the Tenth Circuit discussed in Van Skiver v. United States:

> The kind of legal error that provides the extraordinary circumstances justifying relief under Rule 60(b)(6) is illustrated by Pierce [v. Cook & Co., 518 F.2d 720, 722 (10th Cir. 1975)(en banc)].  In that case, this court granted relief under 60(b)(6) when there had been a post-judgment change in the law "arising out of

the same accident as that in which the plaintiffs . . . were injured." <u>Pierce</u>, 518
F.2d at 723.  However, when the post-judgment change in the law did not arise in
a related case, we have held that "[a] change in the law or in the judicial view of
an established rule of law" does not justify relief under Rule 60(b)(6).  <u>Collins v.
City of Wichita</u>, 254 F.2d 837, 839 (10th Cir. 1958).

952 F.2d at 1244-45.

"Courts have found few narrowly-defined situations that clearly present 'other reasons
justifying relief.'"  Wright et al., <u>supra</u>, § 2864, at 483.  The Supreme Court expounded:

> To justify relief under subsection (6), a party must show "extraordinary
> circumstances" suggesting that the party is faultless in the delay.  If a party is
> partly to blame for the delay, relief must be sought within one year under
> subsection (1) and the party's neglect must be excusable.  In <u>Klapprott</u>, for
> example, the petitioner had been effectively prevented from taking a timely
> appeal of a judgment by incarceration, ill health, and other factors beyond his
> reasonable control.  Four years after a default judgment had been entered against
> him, he sought to reopen the matter under Rule 60(b) and was permitted to do so.

<u>Pioneer Inv. Services Co. v. Brunswick Associates Ltd.</u>, 507 U.S. 380, 393 (citing <u>Liljeberg v.
Health Services Acquisition Corp.</u>, 486 U.S. 847, 863 & n.11; <u>Ackerman v. United States</u>, 340
U.S. 193, 197-200 (1950); <u>Klapprott v. United States</u>, 335 U.S. 601, 613-614 (1949)).  <u>See
Gonzalez v. Crosby</u>, 545 U.S. 524, 535 (2005)("[O]ur cases have required a movant seeking
relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a
final judgment.").  In <u>Gonzalez v. Crosby</u>, the Supreme Court found a change in the law during
the pendency of a habeas petition was not an extraordinary circumstance.  <u>See</u> 545 U.S. at 537.

When the Supreme Court first addressed rule 60(b)(6) a year after it was introduced to
the federal rules, while the Justices were sharply divided on other issues, no dispute arose from
Justice Black's statement: "[O]f course, the one year limitation would control if no more than
'neglect' was disclosed by the petition.  In that event the petitioner could not avail himself of the

broad 'any other reason' clause of 60(b)."  Klapprott v. United States, 335 U.S. at 613.  See Wright et al., supra, § 2864, at 493.

Examples where courts apply rule 60(b)(6) include "settlement agreements when one party fails to comply" and courts use the rule "to return the parties to the status quo," or in cases where fraud is used by a "party's own counsel, by a codefendant, or by a third-party witness," which does not fit within rule 60(b)(3)'s provision for fraud by an adverse party.  Wright et al., supra, § 2864, at 485, 487.  The most common application is to grant relief "when the losing party fails to receive notice of the entry of judgment in time to file an appeal."[11]  Wright et al., supra, § 2864, at 488.  When moving for relief pursuant to rule 60(b)(6), it is not enough to argue the same issues that a court has already addressed.  See Pyeatt v. Does, 19 F. App'x 785, 788 (10th Cir. 2001)(unpublished)("[A] motion to reconsider [that] simply reasserts information considered by the district court in its initial determination . . . does not meet the extraordinary circumstances standard required for Rule 60(b)(6) relief.").

---

[11] Professors Charles Wright and Arthur Miller note that

[m]ost of those cases, however, predate the 1991 amendment to Appellate Rule 4(a)(6), which now provides relief from the strict appellate filing rule if the party did not learn of the entry of the judgment.  In light of that change, most courts have held that resort to Rule 60(b) as a means of extending the appeal time no longer is appropriate, although the Rule 60(b) approach is still utilized in some courts, primarily in the Sixth Circuit.

Wright et al., supra, § 2864, at 489-90 (citations omitted).  See Clark v. Lavallie, 204 F.3d 1038, 1041 (10th Cir. 2000)("Rules 4(a)(6) and 77(d) 'precludes the use of Fed. R. Civ. P. 60(b)(6) to cure problems of lack of notice.'" (citations omitted)).

### LAW REGARDING FEDERAL COURT JURISDICTION TO ENFORCE
### SETTLEMENT AGREEMENTS

"Once a lawsuit is settled and dismissed, the district court does not generally have 'ancillary jurisdiction to enforce the parties' settlement agreement.   A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.'" McKay v. United States, 207 F. App'x 892, 894 (10th Cir. 2006)(unpublished)(quoting Morris v. City of Hobart, 39 F.3d 1105, 1110 (10th Cir. 1994)(citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 380-81). Accordingly, a federal court does not, ipso facto, have jurisdiction over a settlement agreement by virtue of the settlement agreement resolving claims which the federal court previously entertained.   See In re Burlington N. Santa Fe Rail Corp., No. CIV 04-0836 JB/RLP, 2007 WL 5685129, at *12 n.5 (D.N.M. Oct. 11, 2007)(Browning, J.)("The Court has, however, no ancillary jurisdiction over the settlement agreement of the parties, because the Court did not explicitly retain such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion.").

Reference to the settlement agreement in the order dismissing a case is necessary for a court to retain jurisdiction over the agreement after dismissing the parties' claims which the settlement resolved, unless the Court has an independent basis for jurisdiction over the agreement.   "Unless incorporated into a judgment of the court, a settlement agreement is 'a contract, part of the consideration for which [i]s dismissal of a[ ] suit.'" Beetle Plastics Inc. v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., 97 F.3d 1464, 1996 WL 531924, at *1 (10th Cir. Sept. 19, 1996)(unpublished table decision)(quoting Kokkonen v. Guardian Life Ins. Co., 511 U.S. at 381).   "Without reservation by the court . . .

there must be an independent basis for federal jurisdiction." Morris v. City of Hobart, 39 F.3d at

1110-11 (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 382).   If the parties'

"obligation to comply with the terms of the settlement agreement had been made part of the

order of dismissal -- either by separate provision (such as a provision 'retaining jurisdiction' over

the settlement agreement) or by incorporating the terms of the settlement agreement in the

order," the situation is different.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381.

"In that event, a breach of the agreement would be a violation of the order, and ancillary

jurisdiction to enforce the agreement would therefore exist."  Kokkonen v. Guardian Life Ins.

Co. of Am., 511 U.S. at 381.  On the other hand, "[t]he judge's mere awareness and approval of

the terms of the settlement agreement do not suffice to make them part of his order."  Kokkonen

v. Guardian Life Ins. Co. of Am., 511 U.S. at 381.

## LAW REGARDING DIVERSITY JURISDICTION

"Subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) requires: (i) complete diversity

among the parties; and (ii) that 'the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs.'"  Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012 WL

3860748, at *12 (D.N.M. Aug. 27, 2012)(Browning, J.)(citing 28 U.S.C. § 1332(a)).   As the

Court has previously explained, "[t]he Supreme Court of the United States has described this

statutory diversity requirement as 'complete diversity,' and it is present only when no party on

one side of a dispute shares citizenship with any party on the other side of a dispute."  McEntire

v. Kmart Corp., No. CIV 09-0567 JB/LAM, 2010 WL 553443, at *3 (D.N.M. Feb. 9,

2010)(Browning, J.)(citing Strawbridge v. Curtiss, 7 U.S. 267, 267-68 (1806); McPhail v. Deere

& Co., 529 F.3d 947, 951 (2008)).  The amount-in-controversy requirement is an "estimate of the

amount that will be put at issue in the course of the litigation."  Valdez v. Metro. Prop. & Cas. Ins. Co., No. CIV 11-0507 JB/KBM, 2012 WL 1132374, at *15 (D.N.M. Mar. 19, 2012)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 956).

### 1.      Diversity of Citizenship.

For diversity jurisdiction purposes, citizenship is determined by a person's domicile.  See Crowley v. Glaze, 710 F.2d 676, 678 (10th Cir. 1983).  "A person's domicile is defined as the place in which the party has a residence in fact and an intent to remain indefinitely, as of the time of the filing of the lawsuit."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing Crowley v. Glaze, 710 F.2d at 678).  See Freeport-McMoRan, Inc. v. KN Energy, Inc., 498 U.S. 426, 428 (1991)(holding that diversity jurisdiction is assessed as of the time at which the suit is filed).  If neither a person's residence nor the location where the person has an intent to remain can be established, the person's domicile is that of his or her parents' at the time of the person's birth. See Gates v. C.I.R., 199 F.2d 291, 294 (10th Cir. 1952)("[T]he law assigns to every child at its birth a domicile of origin.  The domicile of origin which the law attributes to an individual is the domicile of his parents. It continues until another domicile is lawfully acquired.").  Additionally, "while residence and citizenship are not the same, a person's place of residence is prima facie evidence of his or her citizenship."  McEntire v. Kmart Corp., 2010 WL 553443, at *3 (citing State Farm Mut. Auto. Ins. Co. v. Dyer, 19 F.3d 514, 520 (10th Cir. 1994)).

In terms of determining a corporation's citizenship for diversity purposes, Congress has stated that "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1).  While determining where a corporation is incorporated may

- 33 -

be accomplished by looking to the corporation's incorporating documents, a corporation's "principal place of business" is a more amorphous criteria, and, until recently, the United States' Courts of Appeals had adopted "divergent and increasingly complex interpretations" of the term. Hertz Corp. v. Friend, 130 S.Ct. at 1192.  In Hertz Corp. v. Friend, the Supreme Court clarified the test for determining the location of a corporation's principal place of business.  See 130 S.Ct. at 1192.  Specifically, it held "that 'principal place of business' is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities." 130 S.Ct. at 1192.  The Supreme Court related that this location "is the place that Courts of Appeals have called the corporation's 'nerve center.'"  130 S.Ct. at 1192.  The Supreme Court clarified that, "in practice," this location "should normally be the place where the corporation maintains its headquarters -- provided that the headquarters is the actual center of direction, control, and coordination, i.e., the 'nerve center,' and not simply an office where the corporation holds its board meetings."  130 S.Ct. at 1192.  The Supreme Court stated that "[a] corporation's 'nerve center,' usually its main headquarters, is a single place."  130 S.Ct. at 1193.  The Supreme Court adopted this rule over a different approach some courts had followed that focused on "the total amount of business activities that the corporation conducts" in a state, because: (i) focusing on the total amount of business activities in a state "invites greater litigation and can lead to strange results"; and (ii) "administrative simplicity is a major virtue in a jurisdictional statute." 130 S.Ct. at 1193.

    2.    **Amount in Controversy.**

       The existence of diversity jurisdiction must be established by a preponderance of the evidence.  See McPhail v. Deere & Co., 529 F.3d at 953.  In the context of establishing an

- 34 -

amount-in-controversy, the defendant seeking removal could appear to be bound by the plaintiff's chosen amount of damages in the complaint, which would seem to allow a plaintiff to avoid federal jurisdiction "merely by declining to allege the jurisdictional amount [in controversy]." McPhail v. Deere & Co., 529 F.3d at 955. The Tenth Circuit's decision in McPhail v. Deere & Co. has foreclosed such an option from a plaintiff who wishes to remain in state court. McPhail v. Deere & Co. holds that a defendant's burden in establishing jurisdictional facts is met if the defendant proves "jurisdictional facts that make it possible that $75,000 is in play." 529 F.3d at 955.

In McPhail v. Deere & Co., the Tenth Circuit relied on the Seventh Circuit's decision in Meridian Securities Insurance Co. v. Sadowski, in which the Honorable Frank H. Easterbrook, Circuit Judge, explained how a removing defendant asserting diversity jurisdiction in the face of a silent complaint might proceed:

> [T]he removing defendant, as proponent of federal jurisdiction, must establish what the plaintiff stands to recover. We have suggested several ways in which this may be done -- by contentions, interrogatories or admissions in state court; by calculation from the complaint's allegations[;] by reference to the plaintiff's informal estimates or settlement demands[;] or by introducing evidence, in the form of affidavits from the defendant's employees or experts, about how much it would cost to satisfy the plaintiff's demands. The list is not exclusive; any given proponent of federal jurisdiction may find a better way to establish what the controversy between the parties amounts to, and this demonstration may be made from either side's viewpoint (what a judgment would be worth to the plaintiff, or what compliance with an injunction would cost the defendant). Once the estimate has been made -- and contested factual allegations that support the estimate have been established in a hearing under Rule 12(b)(1) by admissible evidence . . . then the case stays in federal court unless it is legally certain that the controversy is worth less than the jurisdictional minimum.

441 F.3d at 541-42 (citations omitted). The Tenth Circuit adopted the reasoning of the Seventh Circuit, stating:

- 35 -

> *Meridian* eliminates the double standard that would come from misunderstanding what "preponderance of the evidence" requires. The proponent of federal jurisdiction must prove contested facts; and because a defendant has no control over the complaint, he cannot put a large sum of money in controversy simply by demanding it, as a plaintiff often can. But once those underlying facts are proven, a defendant (like a plaintiff) is entitled to stay in federal court unless it is "legally certain" that less than $75,000 is at stake.

McPhail v. Deere & Co., 529 F.3d at 954. Thus, a defendant removing a matter to federal court has met his or her burden in proving the amount-in-controversy requirement if the defendant has proved any contested facts regarding the amount-in-controversy, and the amount-in-controversy is not legally certain to be less than $75,000.00. See 529 F.3d at 954.

As this Court has previously explained, "[i]n the absence of an explicit demand for more than $75,000.00, the defendant must show how much is in controversy through other means." Salazar v. Geico Ins. Co., No. CIV 10-0118 JB/RLP, 2010 WL 2292930, at *3 (D.N.M. Apr. 27, 2010)(Browning, J.)(citing McPhail v. Deere & Co., 529 F.3d at 955). The Tenth Circuit has identified the means upon which a defendant may rely to show how much is in controversy: (i) the defendant may rely on an estimate of the potential damages from the allegations in the complaint; (ii) the defendant may rely on other documentation to provide a basis for determining the amount in controversy, such as interrogatories obtained in the state court before removal, affidavits, or other evidence submitted in federal court afterward; and (iii) the defendant may rely on the plaintiff's proposed settlement amount if it appears to reflect a reasonable estimate of the plaintiff's claim, because the plaintiff's own estimation of its claim is a proper means of supporting the allegations in the notice of removal. See Salazar v. Geico, 2010 WL 2292930, at *3 (citing McPhail v. Deere & Co., 529 F.3d at 956). In McPhail v. Deere & Co., the Tenth Circuit found that the defendant met its burden to support diversity jurisdiction where the

plaintiff's complaint was silent on the amount in controversy.  In its notice of removal, the defendant represented that the amount in controversy exceeded $75,000.00, and incorporated electronic-mail messages and letters of conversations between the parties' attorneys discussing the value of the claim.  The defendant's counsel interpreted the conversation as meaning that the plaintiff was seeking more than $75,000.00, but the plaintiff's counsel refused to concede an amount in controversy in excess of $75,000.00, stating only that "it may very well be" that the amount in controversy would exceed $75,000.00.  529 F.3d at 957.  The Tenth Circuit found that the background information provided enough supplementary information for the district court to conclude that it was not legally certain that the plaintiff would recover an amount less than $75,000.00.  See 529 F.3d at 957.  In so ruling, the Tenth Circuit gave the example of a case in which a defendant has allegedly breached a contract, and the plaintiff seeks damages in an indeterminate amount.  The Tenth Circuit suggested that "a defendant might support jurisdiction by attaching a copy of the contract, valued at more than $75,000, to the notice of removal."  529 F.3d at 956.

An example of an amount-in-controversy which is not legally certain to reach $75,000.00 is seen in Martin v. Franklin Capital Corp., 251 F.3d 1284, 1291 (10th Cir. 2001).  In Martin v. Franklin Capital Corp., the defendant's notice of removal totaled up all of the dollar figures in the plaintiff's complaint, but some of the dollar amounts were considered background information that were not linked to the plaintiff's attempts to recover damages.  See 251 F.3d at 1291.  Because the Tenth Circuit found that the defendant's notice of removal depended on an erroneous "construction of the [plaintiff's] pleading," the Tenth Circuit held that the amount-in-controversy requirement was not met.  251 F.3d at 1291.

<u>ANALYSIS</u>

The Court will deny the Motion to Reopen on the ground that it does not satisfy the exacting demands of rule 60(b), which -- because the Court concludes that the 1992 dismissal is unconditional, and the Order does not incorporate the terms of the Agreement -- is the only motion over which the Court has jurisdiction in the case. Because this conclusion disposes of the case, the Court will not decide whether it has personal jurisdiction over UTAF. The Court also declines to decide whether it would have subject-matter jurisdiction over an independent cause of action -- a new case -- styled from the remains of the Motion to Reopen. Although the Court reserves judgment on these questions, for the parties' convenience and future reference it will provide the basic framework for analyzing those issues.

## I.    THE COURT LACKS SUBJECT-MATTER JURISDICTION TO HEAR ANY MOTION ON THE CLOSED CASE OTHER THAN A RULE 60(b) MOTION, BECAUSE THE DISMISSAL WAS UNCONDITIONAL -- <u>I.E.</u>, THE ORDER DID NOT RETAIN JURISDICTION OVER DISPUTES ARISING FROM PERFORMANCE OF THE AGREEMENT -- AND THE ORDER DID NOT <u>INCORPORATE THE AGREEMENT'S TERMS</u>.

"[A]n unconditional dismissal terminates federal jurisdiction except for the limited purpose of reopening and setting aside the judgment of dismissal within the scope allowed by [Fed. R. Civ. P.] 60(b)."[12]  <u>Smith v. Phillips</u>, 881 F.2d 902, 904 (10th Cir. 1989)(second alteration in original)(quoting <u>McCall-Bey v. Franzen</u>, 777 F.2d 1178, 1190 (7th Cir. 1985))(internal quotation marks omitted). The Motion to Reopen's obvious intent is to exercise

---

[12]  The original basis of subject-matter jurisdiction in this case was federal-question jurisdiction. <u>See</u> 28 U.S.C. § 1331. Even if NMDOL could establish that diversity jurisdiction once existed as a viable independent basis for subject-matter jurisdiction -- <u>i.e.</u>, that the amount-in-controversy exceeds $75,000, and that none of the six plaintiffs is a citizen of New Mexico -- that jurisdiction would also have been terminated upon the case's unconditional dismissal. <u>See</u> 28 U.S.C. § 1332.

a customized procedure outlined in the Agreement, and not to use rule 60(b)'s stock (and substantively stringent) provisions; if this intent was not already clear from the fact that NMDOL's briefs do not once mention the term "60(b)," Motion to Reopen <u>passim</u>; Response <u>passim</u>, it was made explicit at the hearing, <u>see</u> Tr. at 18:3-4 (Branch)("We definitely do not feel that this is a 60(b) motion."); <u>id.</u> at 18:9-11 (Court, Branch)("What you're saying is, Forget 60(b), Judge, it's this motion we agreed to."  "Correct.").  The motion that NMDOL envisions is a creation of the Agreement, not of the Federal Rules or statute.  For its part, the Agreement contemplates such a motion: "Should there be a reduction in funding . . . , NMDOL reserves the right to motion the Court for appropriate relief.  Further, if . . . [it becomes] no longer administratively feasible to continue to implement the particulars of this Stipulation and Agreement of Compromise and Settlement, the NMDOL may upon proper motion ask the Court for relief."  Agreement ¶ 15, at 8.

Such motions, however -- indeed, any motion other than one under rule 60(b) -- are outside of the Court's jurisdiction once the case has been dismissed, provided that the dismissal is "unconditional."  <u>Smith v. Phillips</u>, 881 F.2d at 904.  As relates to dismissal, "conditional" and "unconditional" are not terms that the Federal Rules of Civil Procedure use at all, nor are they commonly used terms in the case law, and there is understandable confusion among the parties: Ms. Simmons believes that the Tenth Circuit was just using a haphazard synonym for "with prejudice," Tr. at 22:25-23:4 (Simmons); NMDOL does not offer a definition, but contends that, whatever "conditional" means, the Order was exactly that with respect to the Agreement, <u>see</u> Tr. 21:11-15 (Branch).

The Court concludes that the origin of the conditional/unconditional distinction is rule 41(a), which provides that a dismissal "by court order . . . may be . . . on terms that the court considers proper," Fed. R. Civ. P. 41(a)(2) (emphasis omitted)(title case omitted); before the 2007 stylistic amendments, the rule provided that "an action shall not be dismissed . . . save upon order of the court and upon such terms and <u>conditions</u> as the court deems proper." Fed. R. Civ. P. 41(a)(2) (2006)(emphasis added). Thus, a dismissal could be "conditional" in myriad ways, most of which would have little or no bearing on the scope of the issuing court's jurisdiction. <u>Smith v. Phillips</u> spells out exactly what condition a court could place on a dismissal to enlarge the court's jurisdiction beyond rule 60(b): "A court . . . may condition a dismissal under Rule 41(a)(2) upon 'such terms and conditions as the court deems proper,' which could include retention of some jurisdiction by the court." 881 F.2d at 904-905 (quoting Fed. R. Civ. P. 41(a)(2) (2006))(citing <u>McCall-Bey v. Franzen</u>, 777 F.2d at 1188-90).

Five years after the <u>Smith v. Phillips</u> decision, the Supreme Court overlaid its own post-dismissal (ancillary) jurisdictional framework on top of the Tenth Circuit's in <u>Kokkonen v. Guardian Life Insurance Co. of America</u>, 511 U.S. 1673 (1994).[13] The Supreme Court made

---

[13] The Court deems <u>Kokkonen v. Guardian Life Insurance Co. of America</u> to be consistent with <u>Smith v. Phillips</u> vis-à-vis dismissals pursuant to rule 41(a)(2). The two cases appear to conflict, however, with regard to whether a dismissal pursuant to rule 41(a)(1)(A)(ii) (providing for dismissal by stipulation of all parties, which does not require a court order) can be conditioned upon the court's retention of jurisdiction -- at least where the parties consent to the court's retaining jurisdiction; both cases seem to agree that the court cannot retain jurisdiction over any party's opposition in a 41(a)(1)(A)(ii) situation. <u>Compare</u> <u>Smith v. Phillips</u>, 881 F.2d at 905 ("A district court . . . is powerless to condition a dismissal under Rule 41(a)(1)(ii) [now 41(a)(1)(A)(ii)] upon a retention of jurisdiction . . . .") <u>with</u> <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. at 381.

Even when . . . the dismissal is pursuant to Rule 41(a)(1)(ii) [now 41(a)(1)(A)(ii)] (which does not by its terms empower a district court to attach conditions to the

clear that, other than rule 60(b) -- which the Supreme Court noted, in passing, some circuits, but not others, use to reopen cases in response to a party's breach of a settlement agreement, <u>see</u> 511 U.S. at 378 -- there are only two ways that a court can retain jurisdiction over a case after its dismissal: (i) including in the order of dismissal a "separate provision" "'retaining jurisdiction' over the settlement agreement," 511 U.S. at 381; or (ii) "by incorporating the terms of the settlement agreement in the order," in which case "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist," 511 U.S. at 381.  It is not clear whether what the Tenth Circuit calls a "conditional dismissal"

_____

> parties' stipulation of dismissal) we think the court is authorized to embody the settlement contract in its dismissal order or, what has the same effect, retain jurisdiction over the settlement contract) [sic] if the parties agree.

<u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. at 381.

The Court is not certain how to resolve this apparent conflict.  The Supreme Court's statement is on the border between dicta and a holding: the dismissal in the case was pursuant to 41(a)(1)[(A)](ii), and the result would seemingly have come out in the opposite direction had the court included a condition in its dismissal order retaining jurisdiction over the performance of the settlement agreement; on the other hand, holding that a court lacks subject-matter jurisdiction when it neglects to include a jurisdiction-retaining condition in its order of dismissal does not logically entail that the inclusion of such a provision would be sufficient to convey jurisdiction, and, as <u>Kokkonen v. Guardian Life Insurance Co. of America</u> itself reminds us, "[i]t is to the holdings of [the Supreme Court's] cases, rather than their dicta, that we must attend."  511 U.S. at 379.  Further obfuscating the issue is the Supreme Court's reference to "embody[ing] the settlement contract in its dismissal order": dismissals pursuant to rule 41(a)(1)(A)(ii) do not involve a court order at all, under either the present day rules or the rules as they existed in 1994.  511 U.S. at 381.  <u>See</u> Fed. R. Civ. P. 41(a)(1)(A)(ii); Fed. R. Civ. P. 41(a)(1)(ii) (1994).

The Court need not decide this issue, as the dismissal in this case -- although it does not reference any specific provision of the rules -- strongly appears to have been entered pursuant to rule 41(a)(2), because it was executed by way of a court order, <u>see</u> Order, and dismissals <u>not</u> pursuant to rule 41(a)(2) do <u>not</u> involve a court order.  The Court is inclined to believe, however, that until the Tenth Circuit backs away from its language in <u>Smith v. Phillips</u>, a district court within the Tenth Circuit is bound by the Tenth Circuit's language, because it can be reconciled with the Supreme Court's language, and a stipulation of dismissal pursuant to rule 41(a)(1)(ii) cannot be conditioned on the retention of any jurisdiction by the court, except under rule 60(b).

- 41 -

encompasses both (i) and (ii), or only (i).  The Court concludes that a conditional dismissal is equivalent to (i) only, because a court is not "conditioning" a dismissal on anything when it simply includes additional commands in its order.  This distinction does not matter for most purposes -- both grounds are obviously sufficient to effectively establish jurisdiction over the performance of the settlement agreement -- but it is potentially analytically significant. Incorporation of settlement agreement terms into the order under (ii) does not truly empower the court to enforce the settlement agreement; it permits the court to enforce its own order.  See Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 371 (10th Cir. 1996).  This difference has implications on the manner of enforcement, as well as the potential relief available: violation of a term incorporated into an order is sanctioned using federal contempt of court proceedings; violation of a settlement agreement over which the court has retained jurisdiction is subject to state contract law regarding the prima facie elements, affirmative defenses, and remedies of and for breach of contract.  See Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 371 (10th Cir. 1996)(Briscoe, J.)("'Standing alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt.' . . . [M]erely retaining jurisdiction to enforce the agreement is not enough to transform it into an order enforceable by contempt." (quoting D. Patrick, Inc. v. Ford Motor Co., 8 F.3d 455, 460 (7th Cir. 1993))); Antony DiSarro, Six Decrees of Separation: Settlement Agreements and Consent Orders in Federal Civil Litigation, 60 Am. U. L. Rev. 275, 279 (2010).

Last, it is important to clarify that -- whether ancillary jurisdiction is being sought under (i) a provision retaining jurisdiction (conditional dismissal) or (ii) incorporation -- it is the text of

- 42 -

the <u>order</u>, not the text of the settlement agreement or the parties' intent to vest the court with continuing jurisdiction,[14] that determines whether the court has ancillary jurisdiction over the settlement agreement's performance.

A.  **THE ORDER DOES NOT RETAIN JURISDICTION OVER THE AGREEMENT'S PERFORMANCE, BECAUSE THE DISMISSAL IS UNCONDITIONAL.**

The Order does not retain jurisdiction over the Agreement's enforcement.  It is not entirely clear what is required to satisfy this ground of ancillary jurisdiction, but the Court in <u>Kokkonnen v. Guardian Life Insurance Co. of America</u> implies, by reusing the exact term, and putting quotes around it without attributing it to any outside source, that the order should use the words "'retain[ ] jurisdiction.'"[15]  511 U.S. at 381.  The Supreme Court also declares that "[t]he judge's mere awareness and approval of the terms of the settlement agreement do not suffice to

---

[14] This conclusion is consistent with the long-standing principle that parties to a lawsuit may not stipulate to subject-matter jurisdiction or waive a defense of lack of subject-matter jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511-12 (10th Cir. 1994).  The Court is to determine its own subject-matter jurisdiction, sua sponte if necessary, in all cases, and "the party seeking to invoke the jurisdiction of a federal court must prove that the case is within the court's subject matter."  43 F.3d at 512.

[15] At the very least, it seems clear that including the words "retain jurisdiction" in a separate provision in the order would be sufficient, if not necessary, to establish ancillary jurisdiction over the enforcement of the settlement agreement.  The full text of the Court's exposition of the two exceptions -- "[t]he situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made a part of the order of dismissal -- either by separate provision (<u>such as</u> a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms . . . ," <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. at 381 (emphasis added) -- cuts against the contention that reciting the words "retain[ ] jurisdiction" is a necessary ingredient in establishing this ground of ancillary jurisdiction.

make them part of his order."[16]  511 U.S. at 381.  Last, the Supreme Court explicitly requires a "separate provision" conditioning the dismissal.  511 U.S. at 381.

Whatever the exact requirements to reserve jurisdiction, it is clear the Order does not meet them.  The only references to the Agreement in the Order are the brief mention that the court has "examined the Stipulation and Agreement of Compromise and Settlement," Order at 1, and the declaration that "the terms and conditions contained in the Stipulation and Agreement of Compromise and Settlement are hereby binding upon the parties," Order ¶ 2, at 1.  These statements constitute "mere awareness and approval of the terms," and in no way indicate an intent or expectation on the part of the court to oversee and exercise jurisdiction over the performance of the contract indefinitely.  Last, it is worth noting that, although NMDOL did not concede this ground, nor did it advance any argument that it satisfied this basis of ancillary jurisdiction, as is its burden.  See Tr. at 14:5-8 (Court, Branch)("So the ball game here is the incorporation side.  You might have an additional argument, but the ball game is the incorporation?"  "Correct, Your Honor.").

---

[16] This declaration may seem to pertain more to the incorporation analysis than to the retention-of-jurisdiction analysis, but the Supreme Court in Kokkonen v. Guardian Life Insurance Co. of America -- untethered, as it is, from Tenth Circuit case law recognizing one ground but not the other -- does not seem to prioritize keeping the two grounds analytically separate.

> The Court presented litigants with two separate avenues for returning to federal court after dismissal of the case . . . [, and t]he use of the disjunctive words 'either' and 'or' plainly indicates that . . . the Court considered both avenues as functionally equivalent . . . .  The Kokkonen Court was wrong to view these two concepts as functionally indistinct.

DiSarro, supra, at 300.

**B.    THE ORDER DOES NOT INCORPORATE THE AGREEMENT'S TERMS, BECAUSE THE TERMS PROVIDE FOR RELIEF THAT, IF ORDERED BY THE COURT, WOULD BE EQUITABLE RELIEF, AND SUCH INCORPORATION MUST BE EXPLICIT, NOT BY REFERENCE, AND, EVEN IF INCORPORATION BY REFERENCE WERE PERMITTED, THE ORDER DOES NOT SUFFICIENTLY MANIFEST AN INTENT TO INCORPORATE THE AGREEMENT.**

NMDOL's primary argument for ancillary jurisdiction[17] -- that the Order incorporates the terms of the Agreement -- also fails.  Although Kokkonen v. Guardian Life Insurance Co. of America does not spell out exactly what is required to satisfy this ground of ancillary jurisdiction, the Court concludes that, to enforce an equitable order that incorporates a settlement agreement's terms, the terms must be "describe[d] in reasonable detail -- and not by referring to the . . . document -- the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(C).  The Agreement's terms, if they had been ordered by the court, would constitute equitable relief -- and are, thus, subject to rule 65(d) -- because the relief "restrains or requires" an "act or acts": the Agreement's terms require NMDOL to maintain an office in Sunland Park.  See Agreement ¶ 9, at 6.  Because the Order does not enumerate or describe any terms, and only makes general mention of the Agreement as a whole, it does not incorporate the terms of the Agreement.  Moreover, even if incorporation by reference were available, which it is not given the

_____

[17] This term has fallen somewhat out of vogue.  The term "supplemental jurisdiction" is now used to refer collectively to the doctrines of ancillary jurisdiction and pendent jurisdiction. 28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (outlining the now-defunct doctrine of pendent-party jurisdiction).  This Memorandum Opinion and Order uses the older term, because it is the term that the Supreme Court used in Kokkonen v. Guardian Life Insurance Co. of America. 511 U.S. 375 passim (1994)(never using the term "supplemental jurisdiction," even though Congress had passed 28 U.S.C. § 1367 four years earlier, Pub. L. No. 101-650, § 310, 104 Stat. 5089 (1990)).

Agreement's terms, the Court still concludes that the Order does not properly incorporate the terms of the Agreement by reference.

> ### 1.   An Order's Incorporation of a Settlement Agreement's Terms That Would Be Equitable Relief If the Court Ordered Them Must Be Explicit, and Not Reliant on Incorporation by Reference.

The Court concludes that, pursuant to rule 65(d), an order purporting to incorporate a settlement agreement's terms that, if ordered by the court, would be equitable relief, may not rely upon the doctrine of incorporation by reference to do so.[18]   Rule 65(d) applies to injunctions and restraining orders, but "'[t]he term 'injunction' in Rule 65(d) is not to be to be read narrowly but includes all equitable decrees compelling obedience under the threat of contempt.'"   Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 370 (10th Cir. 1996)(Briscoe, J.)(quoting Wright et al., supra, § 2955, at 309).   An order that incorporates a settlement agreement's terms that, if ordered by the court would be equitable, is, thus, an injunction for the purposes of rule 65(d) as to those terms[19] that, when ordered by the court, provide equitable relief -- that it compels a party to perform under threat of contempt of court.   See Consumers Gas & Oil, Inc. v.

---

[18] Incorporation by reference is

> [a] method of making a secondary document part of a primary document by including in the primary document a statement that the secondary document should be treated as if it were contained within the primary one.   With a contract, the document to be incorporated must be referred to and described in the contract in such a way that the document's identity is clear beyond doubt. . . .   Not all jurisdictions follow this rule . . . .

Black's Law Dictionary 834 (9th ed. 2009).

[19] If some terms of a settlement agreement, when included in the order, would constitute equitable relief, while others are legal or declaratory, the equitable terms must still be explicitly included in the order pursuant to rule 65(d).   See Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d at 371 (holding that, if a court incorporates some, but not all, terms of a settlement agreement into its order, it may only enforce the incorporated terms).

Farmland Indus., Inc., 84 F.3d at 371 ("'Standing alone, a settlement agreement is nothing more than a contract; the imprimatur of an injunction is required to render it a consent decree enforceable through contempt.'" (quoting D. Patrick, Inc. v. Ford Motor Co., 8 F.3d at 460)). The rule demands that the "order . . . describe in reasonable detail -- and not by referring to the complaint or other document -- the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).[20]

In Consumers Gas & Oil, Inc. v. Farmland Industries, Inc., the Honorable Mary Beck Briscoe, United States Circuit Judge,[21] writing for a unanimous Tenth Circuit panel, held that, for a term in a settlement agreement to be enforceable under a court's contempt powers, the order must comply with rule 65(d), which forbids incorporation by reference:

> Rule 65(d) provides in part: "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; [and] shall describe in reasonable detail, and *not by reference to the complaint or other document*, the act or acts sought to be restrained." The rule is phrased in mandatory language. "[It] expressly proscribes the issuance of an injunction which describes the enjoined conduct by referring to another document." Thomas v. Brock, 810 F.2d 448, 450 (4th Cir. 1987). The proscription protects those who are enjoined by informing them of the specific conduct regulated by the injunction and subject to contempt. See Wright et al., supra, § 2955, at 310.

> The Seventh Circuit has held that a provision of a settlement agreement not explicitly set forth in a judicial order is not enforceable by contempt. H.K. Porter Co. v. National Friction Products, 568 F.2d 24 (7th Cir. 1977). Similarly,

---

[20] The parties' knowledge of, or consent to, an order's incorporation of extrinsic terms by reference does not excuse compliance with rule 65(d), nor does it waive any parties' defense on that ground. See Brumby Metals, Inc. v. Bargen, 275 F.2d 46, 49 (7th Cir. 1960).

[21] Judge Briscoe was elevated to Chief Judge of the Tenth Circuit on May 1, 2010. See Marsi Buckmelter, Update: Tenth Circuit Names New Chief Judge, CBA CLE Legal Connection (May 3, 2010), http://cbaclelegalconnection.com/2010/05/update-tenth-circuit-names-new-chief-judge.

it has held that merely retaining jurisdiction to enforce the agreement is not enough to transform it into an order enforceable by contempt. D. Patrick, Inc. v. Ford Motor Co., 8 F.3d 455, 461 (7th Cir. 1993). Both holdings faithfully apply the plain language of Rule 65(d) by prohibiting incorporation by reference. . . .

. . . .

The Seventh Circuit strictly construes Rule 65(d). See also Seattle-First Nat. Bank v. Manges, 900 F.2d 795, 799 (5th Cir. 1990)(strictly construing "no-reference" requirement of Rule 65(d)); Thomas v. Brock, 810 F.2d at 450 (same). Cf. Hartford-Empire Co. v. United States, 323 U.S. 386, 410 (1945)(eliminating part of injunction enjoining appellants "from violations 'as charged in the complaint'"). Not all circuits strictly construe Rule 65(d). See, e.g., Williams v. City of Dothan, 818 F.2d 755, 761 (11th Cir. 1987)(explaining "Rule 65(d) should not be applied strictly; rather the inquiry should be whether the parties subject to the injunctive order understood their obligations under the order"), modified, 828 F.2d 13 (11th Cir. 1987). This court has not clearly indicated whether Rule 65(d) should be construed strictly. Cf. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Oklahoma Tax Comm'n, 969 F.2d 943, 946 n.3 (10th Cir. 1992)(noting order failed to comply with Rule 65(d), but avoiding issue because parties did not argue violation of Rule 65(d), because all concerned knew scope of injunction, and because order described in "reasonable detail" the conduct enjoined); Commercial Sec. Bank v. Walker Bank & Trust Co., 456 F.2d 1352, 1356 (10th Cir. 1972)(stating generally that "Rule 65 must be strictly complied with"); Munitions Carriers Conference v. American Farm Lines, 440 F.2d 944, 947-48 (10th Cir. 1971)(discussing injunction that referred to enjoinee's duties under various statutes).

Rule 65(d) is clear. "Every order granting an injunction . . . shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." After reviewing the authorities presented by the parties and conducting our own research, we are persuaded the better view is to construe Rule 65(d) strictly and thereby give effect to its plain, mandatory language. By reaching this result, we refrain from substituting ad hoc uncertainty for the rule's uniformity and clarity, and we advance two important functions performed by the rule: (1) to prevent confusion on the part of those faced with injunctive orders and (2) to aid the appellate court in defining the bounds of the injunctive relief, cf. Schmidt v. Lessard, 414 U.S. 473, 476-77, 94 S.Ct. 713, 715-16 (1974)(per curiam)(discussing functions Rule 65(d) designed to perform).

Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d at 370-71 (alterations, excepting first and second ellipses, in original)(emphasis in original).

- 48 -

Thus, if an order were to state that it "incorporates by reference the settlement agreement in full, and hereby orders all parties to comply with the terms of the settlement agreement," the court would not have jurisdiction over the settlement agreement's terms -- to the extent that they "restrain[ ] or require[ ]" an "act or acts" --  and they would be unenforceable by contempt of court or otherwise in federal court.  Fed. R. Civ. P. 65(d)(1)(C).  Such language in an order may be sufficient, however, to impart ancillary jurisdiction over breach-of-contract claims if the agreement is to pay money or something that the court can remedy without using contempt powers.  For example, if the court ordered a defendant to pay money in a discovery order, and incorporates a settlement agreement by reference, the court might be able to reduce the amount to a judgment, thus bypassing rule 65.[22]  On one hand, the purpose of rule 65(d)'s specificity

---

[22] Consumers Gas & Oil, Inc. v. Farmland Industries, Inc. does not address this question; the order in that case explicitly retained jurisdiction over the settlement agreement in a separate provision, thus satisfying the first ground of Kokkomen v. Guardian Life Insurance Co. of America.  The settlement agreement in that case provided that

> the Court reserves continuing jurisdiction over the implementation and enforcement of the terms of the Stipulation of Settlement and any issues relating to Subclass membership, notice to Class Members, distributions to Class Members, allocation of expenses among the class, disposition of unclaimed payment amounts, and all other aspects of this action, until all acts agreed to be performed under the Stipulation of Settlement shall have been performed and the final order of dismissal referenced above has become effective on or until October 1, 1996, whichever occurs latest.

84 F.3d at 369 (emphasis added).  Despite going into far more detail than the Order in this case, the Tenth Circuit ruled that the order in that case did not incorporate the settlement agreement's terms.

Consumers Gas & Oil's argument, which the Tenth Circuit rejected, was that Kokkonen v. Guardian Life Insurance Co. of America, in establishing the "retaining jurisdiction" ground of subject-matter jurisdiction, also enlarged the authority -- beyond the order's four corners -- of the court to sanction parties for contempt.

- 49 -

requirement appears to be one of providing "fair warning" to the parties bound by the order that they will be held in contempt of court if they commit or fail to perform the specific acts enumerated in the order.  Wright et al., supra, § 2955, at 358-59 n.21 (citing Harris v. City of Phila., 47 F.3d 1342, 1349 (3d Cir. 1995)).  The court must, however, first decide the front-end question of federal subject-matter jurisdiction.  The parties know they are bound when they sign

---

Farmland contends contempt was improper because the district court's order did not incorporate the provision of the stipulation prohibiting press releases or communications to the media.  Farmland argues for strict construction of Fed. R. Civ. P. 65(d).  In response, Consumers argues Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375 (1994), overrules the authorities on which Farmland relies.  Consumers misreads Kokkonen.  Kokkonen addresses a jurisdictional question: whether a federal district court has "inherent power" or "ancillary jurisdiction" to enforce a dismissal-producing settlement agreement. Kokkonen holds that a court lacks subject-matter jurisdiction to enforce a settlement absent an independent jurisdictional basis or a reservation of jurisdiction in the order dismissing the action.  Kokkonen neither prohibits nor discourages strict construction of Rule 65(d).

84 F.3d at 370.  In summary, Consumers Gas & Oil's argument was that, when Kokkonen v. Guardian Life Insurance Co. of America listed two alternative processes through which a court can retain jurisdiction over a settlement agreement -- incorporation of its terms into the order or the inclusion of a separate provision in the order retaining jurisdiction -- it was also listing two processes through which the court could enforce the order with contempt of court sanctions; and because only the incorporation process requires compliance with rule 65(d), compliance with rule 65(d) must not be required to invoke contempt of court sanctions.  See 84 F.3d at 370.  The Tenth Circuit in Consumers Gas & Oil, Inc. v. Farmland Industries, Inc. recognized that a separate provision retaining jurisdiction, while sufficient to impart ancillary jurisdiction over the settlement agreement, has nothing to do with making the settlement agreement's terms enforceable under penalty of contempt of court.  See 84 F.3d at 370.  Only the incorporation process accomplishes both continuing jurisdiction and enforceability by contempt, and that process requires compliance with rule 65(d) -- compliance that the Tenth Circuit decided must be "strict."  84 F.3d at 370-71.

Confusion stems from the Supreme Court's equivalence of the two grounds in Kokkonen v. Guardian Life Insurance Co. of America.  Although identical for subject-matter jurisdictional purposes -- and imposing the same restrictions on the parties' primary conduct -- the two processes give rise to different causes of action, which are governed by different bodies of law and are subject to different penalties.  See DiSarro, supra, passim.

the settlement agreement, whether the Agreement is requiring one party to do something; if that is what the parties want the court to have jurisdiction over, then they need to have the order incorporate the terms that, if ordered by the court, would be equitable relief.

The Court concludes that compliance with rule 65(d)'s incorporation requirements of terms that, if ordered by the court, would be equitable relief is required to satisfy the demands of the second ground of Kokkonen v. Guardian Life Insurance Co. of America. To hold otherwise would create a needless distinction in the law, promote sloppy drafting of orders, and engender the exact uncertainty regarding continuing federal jurisdiction that the Supreme Court sought to eliminate in Kokkonen v. Guardian Life Insurance Co. of America. This interpretation comports with that of the United States Court of Appeals for the Fifth Circuit, see Hospitality House, Inc. v. Gilbert, 298 F.3d 424, 431 (5th Cir. 2002),[23] and is more faithful to the text of the Supreme Court's opinion:

> We have recognized inherent authority to appoint counsel to investigate and prosecute violation of a court's order. But the only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged

---

[23] In that case, the Fifth Circuit held that an order must "expressly incorporate[e] the agreement's terms" for the district court to retain jurisdiction. Hospitality House, Inc. v. Gilbert, 298 F.3d at 431. The Fifth Circuit went a step further, holding that, even when a settlement agreement is attached to an order as an exhibit, this proximity does not suffice to impart continuing jurisdiction on the court:

> [E]ven assuming that the Agreement were attached to the order, this fact alone would not be sufficient to incorporate the Agreement into the order under Kokkonen. At most, physical attachment of a settlement agreement to a dismissal order evinces the district judge's "awareness and approval of the terms of the settlement agreement," which "do not suffice to make them part of his order."

298 F.3d at 431 (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381).

breach of the settlement agreement.  The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal . . . by incorporating the terms of the settlement agreement in the order.  <u>In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist.</u>  That, however, was not the case here.  <u>The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order.</u>

<u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. at 380-81 (emphasis added)(citation omitted).  The Supreme Court's core holding in <u>Kokkonen v. Guardian Life Insurance Co. of America</u> is that federal courts have <u>no</u> subject-matter jurisdiction to hear breaches of settlement agreements; it is this principle that determines the outcome.  <u>See</u> 511 U.S. 381-82.  To the extent that the Supreme Court fashions exceptions in its dicta, these exceptions are not to be interpreted beyond their fair import, as doing so vitiates the holding in favor of dicta.  The exception here provides that, if "a breach of the agreement [is] a violation of the order, . . . ancillary jurisdiction . . . exist[s]."  511 U.S. 381.  Although it could be argued that breaching a settlement agreement term in a situation where the order references the settlement agreement constitutes "a violation of the order," this interpretation ignores a body of case law, both pre- and post-dating <u>Kokkonen v. Guardian Life Insurance Co. of America</u>, applying rule 65(d) to alleged violations of equitable court orders.  <u>E.g.</u>, <u>Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.</u>, 84 F.3d at 370-71; <u>D. Patrick, Inc. v. Ford Motor Co.</u>, 8 F.3d 455, 461 (7th Cir. 1993); <u>Thomas v. Brock</u>, 810 F.2d 448, 450 (4th Cir. 1987).

The Supreme Court also explicitly declares that this basis of ancillary jurisdiction emanates from a court's inherent power "to manage its proceedings, vindicate its authority, and effectuate its decrees."  511 U.S. at 380 (contrasting the inherent power basis to the other major basis of ancillary jurisdiction, which exists "to permit disposition by a single court of claims that

are, in varying respects and degrees, factually interdependent," id. at 379).  Asserting subject-matter jurisdiction over a contract dispute -- while explicitly not adjudicating a violation of the court order -- cannot fairly be said to be "effectuating [a] decree."  The court would have to apply state law substantive contract principles, consider state law defenses to breach, and require the observation of state law contract-formation formalities.  This application gives rise to myriad situations in which the court's analysis has zero overlap with a true analysis of a court order violation: (i) if the settlement agreement's terms are ambiguous, it may require supplementation with parol evidence of the parties' intent, which is not only irrelevant to interpreting the content of a court order, but contravenes the purpose of rule 65(d), whose provisions are designed to prevent such ambiguity from ever being present in a court order; (ii) if the settlement agreement was not memorialized in writing, the order might be rendered unenforceable by the statute of frauds, which should have no impact on the enforceability of a court order; and (iii) the court must consider defenses such as mistake, impracticability, and frustration of purpose, which either have no bearing on the question whether a court order was violated, or are the exclusive province of a rule 60(b) motion.

If an order's incorporation by reference of a settlement agreement's terms, which if the court ordered them, would be equitable relief, were sufficient to impart federal subject-matter jurisdiction over the enforcement of the settlement agreement, it would also be unclear whether the parties would be able to consensually modify their settlement agreement after the issuance of the order.  On one hand, contracts -- including settlement agreements -- can generally be

modified without judicial permission.[24]  Because the settlement agreement's original terms are not explicitly part of the order, the parties could agree to strike a term requiring performance by one of the parties, and that party could then cease performing, confident that his behavior would not violate the court order.  Adding new terms to the settlement agreement presents a more difficult question.  The Supreme Court has stated that ancillary jurisdiction exists only when there has been a "violation of the order."  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381 ("In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist."); Black's Law Dictionary 1616 (9th ed. 2009)(defining "therefore" as, "[f]or that reason; on that ground or those grounds").  The question then becomes whether the term "violation of the order" includes conduct that would not have been a violation of the original order on the day it was issued.  If so -- if the scope of the order expands and contracts as the parties add modifications to the settlement agreement -- then this places the court in the unusual, possibly novel, position of having its subject-matter jurisdiction defined unilaterally by private persons, perhaps even without the court's knowledge.[25]

_____

[24] Consent decrees -- orders, enforceable by contempt, in which the terms of the settlement agreement (if there was one) are explicitly recited -- cannot be modified without the court's approval, which it should give only if the "party seeking modification . . . [can] establish[ ] that a significant change in circumstances warrants revision of the decree."  Rufo v. Inmates of Suffolk Cnty. Jail, 502 U.S. 367, 383 (1992).

Ordinary settlement agreements, on the other hand, are subject to normal state law contract principles, and may be modified by the parties without permission from the court.  See 17A C.J.S. Contracts § 546 (2014).

[25] Of course, this problem could also be solved by a rule that says the terms incorporated -- even by reference -- are only those that existed at the time the court entered the order.

Retaining ancillary jurisdiction over a court order that attempts to incorporate by reference a settlement agreement that includes terms that, if ordered by the court, would be equitable relief, also leaves the parties uncertain about the extent of their liability for breach, which in turn has an impact on their primary conduct.  What might be "efficient breach" if the parties are liable only for the other side's expectation damages may become decidedly inefficient if the sanction is contempt of court.  E.g., Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 749 F. Supp. 2d 1235, 1266 (D.N.M. 2010)(Browning, J.)(describing the concept of efficient breach).  The Court can find no case in which an order that fails to comply with rule 65(d) was held unenforceable under the court's contempt power, but was nonetheless deemed enforceable under some lesser power -- such as the power to decide what would normally be a purely state law contract dispute.  To the contrary, in Harford-Empire Co. v. United States, the Supreme Court held that a provision of an order that "generally enjoin[ed] the appellants from violations 'as charged in the complaint'" must be "eliminate[ed] . . . [as] required by . . . the Rules of Civil Procedure, and by our decisions."  323 U.S. 386, 410 (1945)(citing Fed. R. Civ. P. 65(d)).  That decision set forth no alternative mechanism, short of contempt of court, for enforcing the referencing provision.  See 323 U.S. passim.  In Smyth ex rel. Smyth v. Rivero, the United States Court of Appeals for the Fourth Circuit ruled that an order did not incorporate a settlement agreement because "[n]othing in th[e] order suggests that the terms of the parties' agreement are 'incorporated' into the order by a clear indication that they must be complied with pursuant to the order itself, as opposed to the principles of contractual obligation."  282 F.3d 268, 284 (4th Cir. 2002).  As a practical matter, the Supreme Court's statement that "[t]he judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them

part of his order," seems to call for a clear statement in the order as a necessary predicate for continuing jurisdiction, Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381, and rule 65(d) -- with its pre-existing, well-defined guidelines for clarity and specificity in equitable orders -- is an inviting standard to extend into the jurisdictional context where the settlement agreement's terms, if ordered by the court, would be equitable relief.[26]

Last, an unclear order can always be amended pursuant to rule 60(b), or on appeal, if it appears that the judge or the parties intended to incorporate settlement agreement terms, but the order fails to satisfy the formalities of rule 65(d). See D. Patrick, Inc. v. Ford Motor Co., 8 F.3d 455, 461 n.2 (7th Cir. 1993)("Of course, when enforcement problems arise, courts do retain the discretion to amend their decrees to include express commands sufficient to support future contempt proceedings."), cited with approval by FTC v. Kuykendall, 371 F.3d 745, 753 (10th Cir. 2004), and by Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d at 370.   It is fairer to the parties to allow them to argue a rule 60(b) motion to amend an unclear order into one that clearly retains or disclaims jurisdiction, than it is to surprise them with the answer at the point of enforcement.   For the foregoing reasons, the Court concludes that an order's failure to

---

[26] Non-equitable terms may be incorporated into an order by reference to a settlement agreement.  Unlike equitable terms, such terms are not typically enforced directly by contempt of court: when a court orders legal remedies (damages), a party's failure to pay can be sanctioned by the issuance of a lien, foreclosure, or execution, or by the issuance of a new injunction directing the party to pay -- that injunction, not the original order or judgment, is enforceable by contempt, and must comply with rule 65(d)'s formalities, see 30 Am. Jur. 2d. Executions, Etc. §11 (2014); declaratory relief, by its nature, is not "enforced" against any party, and merely "declare[s] the rights and other legal relations of . . . interested part[ies]," thus rendering rule 65(d)'s specificity provisions regarding "acts restrained or required [by the order]" meaningless, 28 U.S.C. § 2201-2202; Fed. R. Civ. P. 65(d)(1)(C).

- 56 -

explicitly incorporate a settlement term that would be equitable relief if ordered by the court puts the term outside the Court's subject-matter jurisdiction.  In sum, if a litigant wants to incorporate a term of a settlement agreement that, if ordered by the court, would be equitable relief, it must incorporate the term into the order and not by reference.  If the settlement agreement only provides for legal relief, the order may incorporate the settlement agreement by reference. Obviously, litigants would be wise -- if they want the court to retain jurisdiction -- to be skeptical of using incorporation by reference, as the lines can get blurry.  And as belts and suspenders, the order should also contain a "separate provision . . . 'retaining jurisdiction'" over the case to the extent necessary to enforce the agreement.  Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. at 381.

Here, stripped of the ability to rely upon incorporation by reference, NMDOL's argument that the Order incorporates the terms of the Agreement disintegrates.  The terms of the Agreement, when ordered by a court, constitute equitable relief, because they compel NMDOL to perform the specific act of "acquir[ing] within a reasonable time certain equipment for use in the Sunland Park office which will provide this itinerant point of services with on-line access to NMDOL's wage information and benefit history."  See Agreement ¶ 9, at 6.  Applying the rule 65(d) factors, the Order does not properly incorporate the Agreement.  The Order must "describe in reasonable detail -- and not by referring to the [Agreement] -- the act or acts restrained or required"; the Order alludes to the existence of terms that "bind[ ] . . . the parties," but only by reference to the Agreement -- and a cursory reference, at that.

      2.        **Even if Incorporation by Reference Were Permissible, the Order Does
Not Properly Incorporate the Agreement by Reference.**

Even if it were permissible for an order to incorporate a settlement agreement's equitable

terms by reference, the Order in this case does not incorporate the Agreement.  The doctrine of

incorporation by reference takes several forms, depending on whether the primary document --

the document that incorporates the secondary document by reference -- is a patent, contract, will,

pleading, or motion.  The primary document here is an equitable court order, and, given that

there is no law on how to apply incorporation by reference in the context of a court order,[27] the

Court will borrow from other contexts in performing its alternative analysis.

In the patent context, the Code of Federal Regulations provides for incorporation by

reference: "'Essential material' may be incorporated by reference, but only by way of an

incorporation by reference to a U.S. Patent . . . which patent . . . does not itself incorporate such

essential material by reference."  37 C.F.R. § 1.57(c).  "Essential material" is that which is

necessary to describe and enable the invention so as to fulfill the requirements of 35 U.S.C.

§ 112.  See 37 C.F.R. § 1.57(c)(1)-(2).

> Material not explicitly contained in the single, prior art document may still be
> considered for purposes of anticipation if that material is incorporated by
> reference into the document.  Incorporation by reference provides a method for
> integrating material from various documents into a host document -- a
> patent . . . -- by citing such material in a manner that makes clear that the material
> is effectively part of the host document as if it were explicitly contained therein.
> To incorporate material by reference, the host document must identify with

---

[27] Actually, there <u>is</u> well-established law on how to incorporate documents by reference
in an equitable court order: do not do it.  <u>See</u> Fed. R. Civ. P. 65(d)(1) ("Every order . . . must . . .
describe in reasonable detail -- and not by referring to the complaint or other document -- the act
or acts restrained or required.");  <u>Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.</u>, 84 F.3d at
370-71 (10th Cir. 1996).

detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents.

Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000)(internal citations omitted).

"An element in a claim . . . may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6.  "The literal scope of a properly construed means plus-function element does not extend to all means for performing a certain function.  Rather, the scope of such claim language is sharply limited to the structure disclosed in a specification and its equivalents."  J & M Corp. v. Harley-Davidson, Inc., 269 F.3d 1360, 1367 (Fed. Cir. 2001).

In the contract context,

[m]atters incorporated by reference or annexed to a contract will be construed as a part of the contract, for the purpose and to the extent indicated.

A contract may validly include provisions of a document that is not physically part of the contract itself, including a document that is not itself a contract.  Matters incorporated into a contract by reference are as much part of the agreement as if they had been set out in the contract verbatim.  This includes references in contracts to statutes, regulations, foreign law, a provision of a general contract in a subcontract, or an employee handbook.  A reference to another writing is sufficient without actual annexation of the writing.  However, if a written contract refers to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified.

For an incorporation by reference to be effective, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.  A reference to another document must be clear and unequivocal, and the terms of the incorporated document must be known or easily available to the parties.  A document is considered incorporated by reference where the incorporating document specifically provides that it is subject to the incorporated one.

However, a mere reference to another document is not sufficient to incorporate that other document into a contract; the writing to which reference is made must be described in such terms that its identity may be ascertained beyond reasonable doubt.

Other writings incorporated by reference as a part of a written contract may properly be considered in the construction of the contract. Where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is incorporated, is to be interpreted as part of the writing; the two writings should be construed together.

17A C.J.S. Contracts § 402 (2014)(footnotes omitted).

In the context of testamentary wills, many jurisdictions have adopted a rule barring incorporation by reference, see 95 C.J.S. Wills § 212 (2014), but New Mexico is not among them, see N.M. Stat. Ann. 1978, § 45-2-510 ("A writing in existence when a will is executed may be incorporated by reference if the language of the will manifests this intent and describes the writing sufficiently to permit its identification."). When the doctrine applies,

[f]or an unattested instrument to be incorporated into and become part of the will or codicil under the doctrine of incorporation by reference, the instrument must be in existence at the time the will is executed. The testator's intention to incorporate the existing document into a will must be clearly manifested in the will. A reference in a will to an extrinsic writing must describe the extrinsic writing with such particularity as to leave no doubt in the court's mind that the writing referred to is the very document offered for probate as having been incorporated by reference. Any paper, not properly executed, but incorporated by reference in a properly executed will and identified by clear and satisfactory proof in that will as the paper referred to, takes effect as part of the will.

Considerable caution must be exercised in applying the doctrine of incorporation by reference. The doctrine of incorporation by reference generally involves documents extrinsic to the will, and as such does not apply to incorporate one paragraph of a will into another. An unattested paper which is of testamentary nature cannot be taken as part of a will even though referred to by that instrument.

Where the attempt to incorporate a document or paper is ineffective, the will cannot be affected by it, and such document or paper can be effective only if it complies with the statute of wills.

95 C.J.S. Wills § 211 (2014)(footnotes omitted).

Last, in the context of court filings, rule 10(c) of the Federal Rules of Civil Procedure outlines the process of "adoption by reference," which provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Fed. R. Civ. P. 10(c) (title case omitted).  In this context: (i) the secondary document must be a pleading -- a complaint, cross-complaint, answer, or reply, see Fed. R. Civ. P. 7; (ii) the primary and secondary documents must be filed in the same case -- referencing a pleading from a different case is impermissible, even if the two cases involve the same parties, see Wright et al., supra, § 1326, at 429; and (iii) a party may not incorporate district court pleadings by reference in an appellate court, see 10th Cir. R. 28.4, 28 U.S.C.; Argota v. Miller, 424 F. App'x 769 (10th Cir. 2011)(unpublished).  Additionally,

> [a]lthough there is no prescribed procedure for referring to incorporated matter, the references to prior allegations must be direct and explicit, in order to enable the responding party to ascertain the nature and extent of the incorporation.  Thus, statements in a counterclaim that the defendant "realleges all of the allegations contained in his amended answer," without greater specificity, have been held to be an insufficient designation of what matter was intended to be incorporated.  Similarly, a sweeping allegation that "each statement and allegation in each count of this Complaint shall be considered as repeated and realleged and incorporated by this reference into any other count of this Complaint where such incorporation shall be or appear necessary to the validity of the cause of action or claim for relief therein stated" was held to be an ineffective incorporation by reference.  As discussed earlier in this section, these types of allegations are precisely what some federal courts have referred to as "shotgun pleading" and sought to discourage.

Wright et al., supra, § 1326, at 431-33 (footnotes omitted).

Synthesizing all of these standards, the Court concludes that the order must not only clearly identify the settlement agreement, but must also evince a clear intent to elevate the

parties' respective obligations under the settlement agreement to the status of a court order.  Had the Order said that it "incorporates the terms of the Agreement as terms of this Order," or that "the Court orders the parties to comply with all of the terms enumerated in the Agreement," then NMDOL could at least present a colorable case for incorporation by reference.  But the Order's statement "[t]hat the terms and conditions contained in the Stipulation and Agreement of Compromise and Settlement are hereby binding upon the parties," Order ¶ 2, at 1, is merely declaratory: it would be true even if the Order had not said it.[28]  This declaration, numbered "2," is listed alongside the similarly declaratory statement, numbered "3," "that the Court's Order of Dismissal With Prejudice does not affect any plaintiff's right to pursue his/her administrative remedies, including appeals to any New Mexico State Courts having jurisdiction," Order ¶ 3, at 1-2.

The Court concludes that NMDOL cannot establish ancillary jurisdiction over the Motion to Reopen on either ground that the Supreme Court provided in Kokkonen v. Guardian Life Insurance Co. of America: the Order is not conditional upon the Court's retention of jurisdiction; nor does it incorporate the Agreement's terms.[29]  If NMDOL wishes to reopen the case, it must do so via rule 60(b).

---

[28] This observation remains true despite that: (i) the numbered list of paragraphs is preceded by the Court's statement that it "orders as follows"; and (ii) the word "hereby" in ¶ 2 is conventionally defined to mean "[b]y this document; by these very words," Black's Law Dictionary 794 (9th ed. 2009), or even, "by virtue of this act, decree, bulletin, or document; by this means," The American Heritage Dictionary of the English Language 616 (William Morris ed., New College ed. 1976).

[29] There is another factor that militates against finding that the Order incorporates the Agreement: the Agreement states, in its first paragraph, that it "is not a consent decree and is not to be construed as such."  Agreement ¶ 1, at 2.

## II.    THE COURT HAS SUBJECT-MATTER JURISDICTION TO ENTERTAIN THE MOTION TO REOPEN AS A MOTION UNDER RULE 60(b), BUT, BECAUSE THE MOTION ESTABLISHES NONE OF THE GROUNDS IN (b)(1)-(6) JUSTIFYING RELIEF, THE COURT DENIES THE MOTION.

The Court will entertain the Motion to Reopen as a motion under rule 60(b), but will deny the motion and will not reopen the case.  The Court always retains jurisdiction to consider a motion to reopen a closed case pursuant to rule 60(b).  See Smith v. Phillips, 881 F.2d 902, 904 (10th Cir. 1989).  The substantive requirements meriting the grant of such a motion are difficult to surmount, however -- and NMDOL fails to do so -- and the time limits imposed by the rule are unforgiving -- and NMDOL fails to meet them.  See Fed. R. Civ. P. 60(b)-(c).  Probably five, but at least three, of the six potential grounds for relief under rule 60(b) are time-barred, and the facts alleged in the Motion to Reopen satisfy none of the potentially remaining three grounds enumerated in rule 60(b)(4)-(6) as justifying relief from an order or judgment.

---

A "consent decree" is "[a] court decree that all parties agree to" and is "also termed a consent order."  Black's Law Dictionary 471 (9th ed. 2009).  The overlap between "orders incorporating the terms of the settlement agreement" and consent decrees is nearly complete: (i) consent decrees automatically vest the court with continuing jurisdiction; (ii) jurisdiction is limited to enforcing the terms explicitly enumerated in the decree; (iii) the decree, although carrying the force of a court order, is imposed voluntarily, codifying an agreement among the parties; and (iv) non-compliance with a consent decree is contempt of court and not simply breach of contract.  Orders of dismissal issued pursuant to the "retaining jurisdiction" ground are not consent decrees, but, rather, conditional dismissals; any action for violation of the settlement agreement arises from the agreement itself, sounds in contract, and is an essentially private dispute between the parties -- even if the court has retained jurisdiction to referee the dispute.  Although it is possible for parties to enter into a consent decree in the absence of a separate settlement agreement, it would appear that all orders incorporating settlement agreements are, by definition, consent decrees.

Although it is the text of the Order, not the Agreement, that is relevant, the Court thinks that Judge Bratton would likely have made the parties remove that line if he had, in fact, been fashioning a consent decree incorporating the Agreement -- including that very term -- into the Order.

### A. GROUNDS (b)(1) THROUGH (b)(3) ARE TIME-BARRED PURSUANT TO RULE 60(C)(1), AND GROUNDS (b)(5) AND (b)(6) MOST LIKELY ARE AS WELL.

"A motion under Rule 60(b) must be made within a reasonable time -- and for reasons (1), (2) and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." Fed. R. Civ. P. 60(c)(1). NMDOL acknowledges that any action under rule 60(b) would face "an issue of time limits," Tr. at 18:23-25 (Branch), and this in an understatement: half of the grounds for relief under rule 60(b) -- including the most promising ground, (b)(1) -- are barred. Although the Court generally has discretion to extend the default deadlines for most motions, "[a] court must not extend the time to act under Rule[ ] . . . 60(b)." Fed. R. Civ. P. 6(b)(2). See Alexander v. Walmart Stores, Inc., No. CIV 08-00070 WDM/MEH, 2009 WL 1537860 (D. Colo. June 1, 2009).

Motions asserting grounds (b)(5) or (b)(6) must be filed "within a reasonable time,"[30] Fed. R. Civ. P. 60(c)(1), a time limit that -- while inherently subjective, and potentially extending beyond the one-year limit imposed on grounds (b)(1), (b)(2), and (b)(3) -- is not the same as there being no time limit. "What constitutes reasonable time necessarily depends on the facts in each individual case. The courts consider whether the party opposing the motion has been prejudiced by the delay in seeking relief and whether the moving party had some good reason for the failure to take appropriate action sooner." Wright et al., supra, § 2866, at 536-37. See Ashford v. Steuart, 657 F.2d 1052, 1055 (9th Cir. 1981)(per curiam); PRC Harris, Inc. v. Boeing

---

[30] Despite the lack of an explicit exemption from the provisions of rule 60(c)(1), there is generally said to be no time limit for filing a motion pursuant to rule 60(b)(4). See V.T.A., Inc. v. Airco, Inc., 597 F.2d 220, 224 (10th Cir. 1979); Wright et al., supra, § 2866, at 535 & n.4.

Co., 700 F.2d 894, 897 (2d Cir. 1983); Farm Credit Bank of Balt. v. Ferrera-Goitia, 316 F.3d 62, 66 (1st Cir. 2003).

> The cases show that although the courts have sought to accomplish justice, they have administered Rule 60(b) with a scrupulous regard for the aims of finality. Thus they have held that the motion must be made within a "reasonable time," even though the stated time limit has not expired. They have been unyielding in requiring that a party show good reason for the failure to take appropriate action sooner.

Wright et al., supra, § 2857, at 326-27 (footnotes omitted).

The Court concludes that the Motion to Reopen was not made within a reasonable time. First, rule 60(c)(1)'s stock deadline of one year, while inapplicable, is at least probative of the general range of reasonable timeliness for submission of a rule 60(b) motion; NMDOL waited twenty times this long to file its Motion to Reopen.[31] Next, applying the two formal factors for determining whether a delay is reasonable, the Court concludes that there is not good cause for NMDOL's delay in filing the motion and that the Plaintiffs will be severely prejudiced by the delay.

There is not good cause for the delay, because: (i) legally, although the Agreement and Order were entered before the development of much of the case law alerting NMDOL to the possibility that its custom-made motion in ¶ 15 of the Agreement might not remain exercisable in perpetuity, the controlling cases on this topic were decided in 1989, 1994, and 1996 -- still almost two decades before NMDOL got around to filing its motion, see Smith v. Phillips, 881

---

[31] This calculation is a rough measure and likely would not assist the Court were the discrepancy not so extreme. For example, if the stock time limit was expressed in units of hours or days, a delay measured in years would be presumptively unreasonable; if the limit was expressed in eons, the same delay would be presumptively reasonable. Here, the stock limit is expressed in years, while the delay in filing is measured in decades.

F.2d 902 (1989); Kokkonen v. Guardian Ins. Co. of Am., 511 U.S. 375 (1994); Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367 (1996); and (ii) factually, none of the reasons NMDOL gives for the obsolescence of the Sunland Park office, with one exception,[32] are alleged to have arisen recently -- online and telephonic claim-filing systems are not brand new, see Motion to Reopen ¶ 10, at 2, nor is the call center, see Motion to Reopen ¶ 11, at 2, nor is "increased access to computers and telephones," generally, Motion to Reopen ¶ 9, at 2, nor is NMDOL's obligation to pay rent and wages to maintain the office, see Motion to Reopen ¶ 22, at 4, nor is the existence of various public libraries and colleges with internet access, or their proximity to Sunland Park, see Motion to Reopen ¶¶ 13-19, at 3, and nor, so far as the Court can tell from the facts alleged, are NMDOL's unspecified "current budgetary considerations," Motion to Reopen ¶ 21, at 4.

The Plaintiffs would be prejudiced by a grant of the Motion to Reopen, because NMDOL's delay has been so great that it has degraded the available evidence, as well as the Plaintiffs' capacity to advocate for themselves: with the exception of Ms. Simmons[33] -- who opposes the Motion to Reopen -- most of the individuals involved in the litigation of the original

---

[32] NMDOL alleges that, "[a]s of January 2013, potential claimants and employers are able to utilize a new electronic process to file claims, certify work searches, and file reports." Motion to Reopen ¶ 12, at 3. Were this one factual development the primary impetus for the Motion to Reopen, then the 'reason for not acting sooner' factor might cut in NMDOL's favor.

[33] Even Ms. Simmons is impaired in her advocacy by her uncertain relationship with UTAF, with whom she seems to have had relatively little contact in recent years. The uncertainty about the existence of an attorney-client relationship has necessitated her entering multiple "special appearances," and could potentially preclude her from advancing meritorious arguments, on the ground that such arguments might waive rights or foreclose other arguments that UTAF may wish to assert in the future. See MTD at 1; Reply at 1; Tr. at 1:14-17 (Simmons).

case, the negotiation of the Agreement, and the issuance of the Order have ceased their involvement in this case[34] or died.[35]

Last, even to the extent that the degradation of evidence does not directly prejudice UTAF, it diminishes the capacity of the Court to competently fact-find and rule on the merits of the Motion to Reopen.  This diminished capacity further militates in favor of finding that NMDOL's delay in filing was unreasonable and leaving the settled judgment in place.  On the limited record before the Court, the rule 60(b)(1), (2), (3), (5), and (6) motion is untimely.

### B.    EVEN IF THE MOTION HAD BEEN FILED WITHIN A REASONABLE TIME, THE MOTION TO REOPEN DOES NOT SATISFY RULE 60(b)(4)'S, (b)(5)'S, OR (b)(6)'S REQUIREMENTS.

Even if the Court were to assume, contrary to its actual conclusion, that the Motion to Consider was filed within a reasonable time, it still fails to satisfy the substantive requirements justifying relief from an order pursuant to rule 60(b)(4), (b)(5), or (b)(6).  The grant of such relief is subject to the Court's discretion, and although

> [a] number of cases say that discretion ordinarily should incline toward granting rather than denying relief, . . .

---

[34] No one represents or even appears to know where any of the six individual named Plaintiffs are today.  See Dean Email at 2; Tr. at 1:16-17.  The lawyers currently representing NMDOL are different from those present for the 1992 Agreement and Order.  Compare Civil Docket for Case #: 2:91-cv-00509-JB-WPL, CM/ECF (last modified Nov. 7, 2013), https://ecf.nmd.circ10.dcn/cgi-bin/DktRpt.pl?303494930139639-L_1_0-1 (login required) with Motion to Reopen at 5, Dean Email passim, Response at 9, and Tr. at 1:22-24.  Other than Ms. Simmons, none of the TRLA attorneys present for the 1992 Agreement and Order have appeared to assist in the disposition of the Motion to Reopen.

[35] Judge Bratton, who presided over the case from 1991-1992 and signed the Order, died on May 5, 2002.  See Order at 2; Biographical Directory of Federal Judges: Bratton, Howard C., Federal Judicial Center (last visited Mar. 25, 2014), http://www.fjc.gov/servlet/nGetInfo?jid=243&cid=999&ctype=na&instate=na.

> [t]he cases calling for great liberality in granting Rule 60(b) motions, for the most part, have involved default judgments. There is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits.

Wright et al., supra, § 2857, at 321-22, 324 (footnotes omitted).

### 1.    Relief Under Rule 60(b)(4) Is Not Available.

Ground (b)(4) is a tempting choice for NMDOL to seek relief under only because it is the sole ground that is clearly not time-barred. See V.T.A., Inc. v. Airco, Inc., 597 F.2d 220, 224 (10th Cir. 1979)("[Rule] 60(b)(4) is not subject to any time limitation."); Wright et al., supra, § 2866, at 535 & n.4. Relief under this provision can be granted only if the order is void, and

> [a] judgment is not void merely because it is or may be erroneous. Marshall v. Bd. of Educ., 575 F.2d 417, 422 (3d Cir. 1978); Lubben v. Selective Serv. Sys. Local Bd. No. 27, 453 F.2d 645, 649 (1st Cir. 1972). See Chicot Cnty. Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 374-78 (1940). For a judgment to be void under Rule 60(b)(4), it must be determined that the rendering court was powerless to enter it. If found at all, voidness usually arises for lack of subject matter jurisdiction or jurisdiction over the parties. It may also arise if the court's action involves a plain usurpation of power or if the court has acted in a manner inconsistent with due process of law. In the interest of finality, the concept of setting aside a judgment on voidness grounds is narrowly restricted.

V.T.A., Inc. v. Airco, Inc., 597 F.2d at 224-25 (footnotes omitted). There is no contention from the parties, nor is there reason to suspect, that the Court lacked subject-matter or personal jurisdiction to hear the case from the time it was filed to the time the Order was entered. Judge Bratton obviously determined that there was jurisdiction to proceed, and the Court sees no reason to question that decision. The Order is valid, and rule 60(b)(4) is inapplicable.

### 2.    Relief Under Rule 60(b)(5) Is Not Available.

Rule 60(b)(5) applies if an order: (i) "has been satisfied, released or discharged"; (ii) "is based on an earlier judgment that has been reversed or vacated," meaning that the order was

- 68 -

compelled by the application of res judicata or collateral estoppel, and the preclusive judgment or order is no longer as it was when the preclusion doctrine was applied, see Casias v. Sw. Med. Assocs., No. CIV 04-0142 JB/ACT, 2005 WL 3662924, at *5 (D.N.M. Oct. 31, 2005)(Browning, J.)(citing Klein v. United States, 880 F.2d 250, 258 n.10 (10th Cir. 1989)); or (iii) "is no longer equitable" to "apply[ ] prospectively."  Fed. R. Civ. P. 60(b)(5).  Grounds (i) and (ii) "ha[ve] been relied on very rarely[,] . . . ha[ve] very little application," and are inapposite here.  Wright et al., supra, § 2863, at 450, 451.

The third ground, that an order is no longer equitable to apply prospectively, perhaps provides NMDOL's strongest chance of success.  The Court can find no case applying this ground to relieve a party of its obligations to perform under a settlement agreement[36] -- and it is not entirely clear which direction this fact would cut[37] -- but there is a trend in the case law favoring relief pursuant to rule 60(b)(5) in the context of "institutional reform litigation," and there is strong Supreme Court dicta suggesting that consent decrees in this context are amendable

---

[36] There are cases that relieve a party of its obligations to perform under a settlement agreement where full performance would run afoul of double-recovery or similar principles, but these motions are styled as instances in which the judgment "has been satisfied, released, or discharged."  Fed. R. Civ. P. 60(b)(5).  See, e.g., Snowden v. D.C. Transit Sys., Inc., 454 F.2d 1047, 1048 & n.4 (D.C. Cir. 1971).

[37] On one hand, "[t]here is much more reason for liberality in reopening a judgment when the merits of the case never have been considered than there is when the judgment comes after a full trial on the merits."  Wright et al., supra, § 2857, at 324 (footnotes omitted).  On the other, the fact that the movant consented to the obligations from which he is moving for relief, as well as the general policy of promoting settlement and the finality of judgments, support raising rule 60(b)(5)'s bar higher for orders that effectuate a settlement agreement than for orders by judicial fiat.  "The vast majority of cases are settled, as everyone knows, and Rule 60(b)(5) simply cannot be read so as to expose each settlement to equitable re-examination."  Schwartz v. United States, 976 F.2d 213, 218 (4th Cir. 1992).

to rule 60(b)(5) treatment.  Horne v. Flores, 557 U.S. 433, 447-48 (2009).  The Honorable

Samuel A. Alito, Justice of the United States Supreme Court, wrote a five-to-four majority

opinion that states:

> Rule 60(b)(5) serves a particularly important function in what we have
> termed "institutional reform litigation."  Rufo v. Inmates of Suffolk Cnty. Jail,
> 502 U.S. 367, 380 (1992).  For one thing, injunctions issued in such cases often
> remain in force for many years, and the passage of time frequently brings about
> changed circumstances -- changes in the nature of the underlying problem,
> changes in governing law or its interpretation by the courts, and new policy
> insights -- that warrant reexamination of the original judgment.
>
> Second, institutional reform injunctions often raise sensitive federalism
> concerns.  Such litigation commonly involves areas of core state responsibility,
> such as public education.
>
> Federalism concerns are heightened when, as in these cases, a federal
> court decree has the effect of dictating state or local budget priorities.  States and
> local governments have limited funds.  When a federal court orders that money be
> appropriated for one program, the effect is often to take funds away from other
> important programs.  See Missouri v. Jenkins, 515 U.S. at 131 (Thomas, J.,
> concurring)("A structural reform decree eviscerates a State's discretionary
> authority over its own program and budgets and forces state officials to reallocate
> state resources and funds.").
>
> Finally, the dynamics of institutional reform litigation differ from those of
> other cases.  Scholars have noted that public officials sometimes consent to, or
> refrain from vigorously opposing, decrees that go well beyond what is required by
> federal law.  See, e.g., Donald L. Horowitz, Decreeing Organizational Change:
> Judicial Supervision of Public Institutions, 1983 Duke L.J. 1265, 1294-1295
> ("Nominal defendants [in institutional reform cases] are sometimes happy to be
> sued and happier still to lose"); R. Sandler & D. Schoenbrod, Democracy by
> Decree: What Happens When Courts Run Government 170 (2003)("Government
> officials, who always operate under fiscal and political constraints, 'frequently
> win by losing'" in institutional reform litigation.").
>
> Injunctions of this sort bind state and local officials to the policy
> preferences of their predecessors and may thereby "improperly deprive future
> officials of their designated legislative and executive powers."  Frew v. Hawkins,
> 540 U.S. 431, 441 (2004).  See also Nw. Env't Advocates v. EPA, 340 F.3d 853,
> 855 (9th Cir. 2003)(Kleinfeld, J., dissenting)(noting that consent decrees present a
> risk of collusion between advocacy groups and executive officials who want to

bind the hands of future policymakers); Ragsdale v. Turnock, 941 F.2d 501, 517 (7th Cir. 1991)(Flaum, J., concurring in part and dissenting in part)("[I]t is not uncommon for consent decrees to be entered into on terms favorable to those challenging governmental action because of rifts within the bureaucracy or between the executive and legislative branches"); Frank H. Easterbrook, Justice and Contract in Consent Judgments, 1987 U. Chi. Legal Forum 19, 40 ("Tomorrow's officeholder may conclude that today's is wrong, and there is no reason why embedding the regulation in a consent decree should immunize it from reexamination.").

States and localities "depen[d] upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources." Frew v. Hawkins, 540 U.S. at 442. Where "state and local officials . . . inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents," they are constrained in their ability to fulfill their duties as democratically-elected officials.

It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief. But in recognition of the features of institutional reform decrees, we have held that courts must take a "flexible approach" to Rule 60(b)(5) motions addressing such decrees. Rufo v. Inmates of Suffolk Cnty., 502 U.S. at 381. A flexible approach allows courts to ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" when the circumstances warrant. Frew v. Hawkins, 540 U.S. at 442. In applying this flexible approach, courts must remain attentive to the fact that "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." Milliken v. Bradley, 433 U.S. 267 (1977). "If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law," it may "improperly deprive future officials of their designated legislative and executive powers." Frew v. Hawkins, 540 U.S. at 441.

For these reasons, a critical question in this Rule 60(b)(5) inquiry is whether the objective of the . . . order -- i.e., [bring the government entity into compliance with federal law] -- has been achieved. See 540 U.S. at 442. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper. See Milliken v. Bradley, 433 U.S. at 282.

Horne v. Flores, 557 U.S. at 447-50 (alterations, excepting those in final paragraph, in original)(emphasis in original)(footnotes omitted)(some citations omitted).

It is not clear whether this case should be analyzed as an institutional reform litigation case.  On the one hand, it involves an Agreement to which former policymakers stipulated but that binds current policymakers, and there are federalism concerns implicated in a federal court ordering the State of New Mexico to run its Departments in a certain fashion.[38]  On the other hand, the Order in this case does not effectuate a broad, sweeping reform that rises to the level of overriding the policy preferences, subsidiarity, or autonomy of the people of New Mexico.  This case is no Brown v. Board of Education: the cost of the Sunland Park office is relatively small in the grand scheme of NMDOL's budget, and it is difficult to believe that enforcing the Order "has the effect of dictating state or local budget priorities" by prohibitively restricting the amount of money that NMDOL has to devote to its other projects.  Horne v. Flores, 557 U.S. at 448.  As to the question whether the "decree[ ] go[es] well beyond what is required by federal law," the Court cannot determine that issue without delving into the merits of the underlying 1991 case, which the Court has yet to open.  Horne v. Flores, 557 U.S. at 448.  Even less accessible is the answer to the question whether NMDOL's contemporary leaders or representatives intentionally entered into an overly generous settlement agreement out of political expediency or because of ideological convictions that go beyond the demands of federal law.  See 557 U.S. at 448.

The Court will not rely on the institutional reform litigation framework, and instead concludes that the determinative factor in the (b)(5) analysis is the requirement, implicit in the

---

[38]  Unlike lawsuits "involv[ing] areas of core state responsibility, such as public education," this lawsuit -- and the Agreement it ultimately produced -- concerns an area of joint federal and state concern: administration of unemployment benefits pursuant to the Social Security Act.  Horne v. Flores, 557 U.S. at 448; 42 U.S.C. § 501 et seq.

rule, "that the changed circumstances" that allegedly make prospective application of the Order[39]

inequitable, could not have been "contemplated at the time the decree was entered."  Wright et

al., supra, § 2863, at 463, 469.  See Agostini v. Felton, 521 U.S. 203, 216-17 (1997).  Such

changed circumstances could include "subsequent legislation, a change in the decisional law, or

a change in the operative facts."  Wright et al., supra, § 2863, at 473, 476 (footnotes omitted).

That NMDOL no longer desires to devote the funds and the staff to maintaining the Sunland

Park office is, on its own, unpersuasive -- it knew of that obligation at the time it entered into the

Agreement.  The main changed circumstances supporting relief are the facts that: (i) legally, it

was not clear at the time NMDOL entered into the Agreement that it would be unable to exercise

the contingency provision outlined in ¶ 15 on its own custom-made terms; and (ii) factually, it

was unforeseen that technological developments would obviate much of the need for physical

---

[39] The Court has already concluded that the Order did not incorporate the Agreement, so the Court's rule 60(b)(5) analysis must be careful not to equate enforcement of the Agreement -- which unquestionably binds NMDOL -- with enforcement of the Order -- which merely restates the parties' obligation to follow the Agreement.  Only hardships resulting from the Order's enforcement justify relief under rule 60(b)(5), and, thus, (b)(5) may be altogether inapplicable. The Court might be able to judicially reform the Agreement if it reopened the case pursuant to rule 60(b), however, and because that relief vindicates the harm to which provision (b)(5) refers, the Court will consider the possibility that (b)(5) applies.  It could be that the more appropriate vehicle for NMDOL to seek judicial reformation of the Agreement is by filing a new lawsuit in state court or -- if an independent ground of subject-matter jurisdiction can be established -- in federal court.

This observation cuts further against treating this case as an institutional reform litigation case.  Because the terms of the Agreement were not incorporated into the Order, the Court cannot and will not exercise direct control over NMDOL's performance of its contractual obligations.  For this reason, and because the state courts have concurrent jurisdiction over disputes arising from the Agreement -- indeed, it is federal jurisdiction that is uncertain -- the federalism concerns presented by this case are minimal.

offices in remote locations like Sunland Park.  At this point, the analysis resembles the one already conducted on rule 60(c)(1)'s "reasonable time" requirement: (i) legally, although the Settlement and Order were entered before the development of much of the case law alerting NMDOL to the possibility that its custom-made motion in ¶ 15 of the Agreement might not remain exercisable in perpetuity, the controlling cases on this topic were decided almost two decades before NMDOL got around to filing its motion; and (ii) factually, almost none of the reasons NMDOL gives for the obsolescence of the Sunland Park office are alleged to have arisen recently.  Although this analysis merges the substantive components of rule 60(b)(5) with the timeliness component of rule 60(c)(1), such a merger is required in a "changed circumstances" analysis.  If the only relevant consideration was the difference in state of affairs between the time the order issued, and the time the rule 60(b) motion was filed, then it would behoove all parties to wait as long as possible to file their rule 60(b) motions, as circumstances change more over longer periods of time than shorter ones.

The Court concludes that it is not inequitable to continue to impose the same obligations on NMDOL that it has shouldered for the past two decades -- the same obligations that it agreed to shoulder.  It is unfortunate that NMDOL is not afforded the opportunity to argue for the closure of the Sunland Park office in the manner that ¶ 15 of the Agreement lays out, as that was NMDOL's fair expectation when it entered into the Agreement.  The unenforceability of that provision, however, is dictated by case law that came out almost two decades ago.  NMDOL cannot now argue that changed circumstances compel relief from the Agreement, where the interpretation of the Agreement has been static for almost twenty years.

### 3.      Relief Under Rule 60(b)(6) Is Not Available.

According to Professors Charles Wright and Arthur Miller,

> the leading cases speaking of a requirement of exceptional or extraordinary circumstances have been cases of motions under Rule 60(b)(6). That subdivision of the rule does require a very special showing by the moving party and it does not assist sound analysis to repeat those phrases in cases brought pursuant to the other portions of Rule 60(b), under which a less demanding standard applies.

Wright et al., supra, § 2857, at 326 (footnotes omitted).

The substantive demands of "clause (6) and clauses (1) through (5) are mutually exclusive." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 n.11 (1988). This exclusivity means that, while some facts may be pertinent to more than one ground of relief under rule 60(b), the legal basis for relief under (b)(6) must not justify relief under any of (b)(1)-(5). An argument is not considered to be exclusive to (b)(6) if it would satisfy (b)(1), (b)(2), or (b)(3) but for the fact that the motion was filed more than a year after the entry of the order.

The Court will not delve into the substantive requirements of rule 60(b)(6). It suffices that the burden is on NMDOL to demonstrate "exceptional or extraordinary circumstances," and NMDOL has advanced no rule 60(b) argument at all, let alone an extraordinary one, let alone one that would fall outside of the scope of the other five grounds for relief. See Motion to Reopen passim; Response passim; Tr. at 18:3-4 (Branch)("We definitely do not feel that this is a 60(b) motion."); Tr. at 18:9-11 (Court, Branch)("What you're saying is, [f]orget 60(b), Judge, it's this motion we agreed to." "Correct.").

The Court concludes that Motion to Reopen, when styled as a motion under rule 60(b), is time-barred, and that, even if it were not, it would still fail to satisfy any of the grounds justifying relief under the rule. The Court will, thus, deny the Motion to Reopen.

**III.   IF THE MOTION TO REOPEN WERE STYLED AS AN INDEPENDENT CAUSE OF ACTION -- A NEW CASE -- THE COURT WOULD STILL LACK FEDERAL QUESTION AND ANCILLARY JURISDICTION, BUT MAY HAVE DIVERSITY JURISDICTION.**

If NMDOL were to re-file its Motion to Reopen as an independent cause of action for declaratory relief, or if UTAF were to file a new claim alleging breach of contract, the Court would lack federal-question jurisdiction and ancillary jurisdiction, but might have subject-matter jurisdiction on diversity grounds. See 28 U.S.C. § 1332. The burden of proving that the Court has subject-matter jurisdiction over a case is on the plaintiff, see Henry v. Office of Thrift Supervision, 43 F.3d 507, 511-12 (10th Cir. 1994), and the Court will also consider the issue sua sponte -- the parties may not waive subject-matter jurisdiction, nor may they stipulate or consent to a court hearing a case over which it lacks subject-matter jurisdiction, see 43 F.3d at 512.

Both federal question jurisdiction, see 28 U.S.C. § 1331, and ancillary jurisdiction, see 28 U.S.C. § 1367; United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966), went out the window with the Court's ruling that it will not reopen the 1991 case. Ancillary jurisdiction never applies to a newly filed case. Federal-question jurisdiction requires that a substantial, actually disputed federal question -- whose resolution is necessary to the disposition of the claim[40] -- be raised on the face of the well-pleaded complaint.[41]   See Grable & Sons Metal Prods., Inc. v.

---

[40]   There is an additional, rarely-used requirement: the federal court's exercise of jurisdiction over the case must not upset "any congressionally approved balance of federal and state judicial responsibilities." Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 312 (2005).

[41]   There is an additional wrinkle to the application of the well-pleaded complaint rule in cases in which declaratory judgment is sought. See Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950). The court must anticipate what suit would arise if the parties continued their courses of conduct without the direction of declaratory relief; i.e., a case does not "arise under" § 2201 for the purposes of

<u>Darue Eng'g & Mfg.</u>, 545 U.S. 308, 312 (2005); <u>Louisville & Nashville R.R. Co. v. Mottley</u>, 211 U.S. 149 (1908).  Here, all claims arise out of a private contract -- the Agreement -- between two parties, and no federal question need be stated on the face of the well-pleaded complaint.

The Court might, however, have diversity jurisdiction.  Diversity jurisdiction requires that both: (i) no plaintiff is a citizen of the same state as any defendant; and (ii) the amount-in-controversy exceeds $75,000, exclusive of interests and costs.  <u>See</u> 28 U.S.C. § 1332.  The plaintiff in any future case -- most likely NMDOL -- would need to prove the following as-yet-unestablished facts to the Court's satisfaction: (i) that UTAF is a citizen of Texas; (ii) that no citizen of New Mexico be named as a defendant -- this requirement means that they must not be "persons required to be joined" or that UTAF can establish that their joinder is not feasible, Fed. R. Civ. P. 19; and (iii) that the dispute could plausibly involve an award of over $75,000.00.  If Ms. Simmons' contention that none of the original Plaintiffs in this case other than UTAF were parties to the contract is correct, then mostly likely no party other than UTAF need be joined. <u>See</u> Tr. at 31:9-15 (Simmons, Court).

## IV.   THE COURT WILL RESERVE JUDGMENT WHETHER IT HAS PERSONAL JURISDICTION OVER UTAF.

It is not necessary for the Court to determine whether NMDOL's service of the Motion to Reopen was proper under rule 5(b)(1).  As the denial of the Motion to Reopen on subject-matter jurisdictional grounds -- and, when styled as a rule 60(b) motion, on the merits -- brings the 1991 case to an end, the Court does not need to decide the issue.  And unlike the question of subject-

---

establishing federal-question jurisdiction.  In this case, any foreseeable claims for declaratory judgment would be analyzed as breach-of-contract claims for the purposes of federal-question jurisdiction.

matter jurisdiction, any analysis the Court could conduct on the issues of personal jurisdiction and adequacy of service in the 1991 case would be almost completely irrelevant and unhelpful to any future actions that might be filed by the parties.   While rule 5's relatively permissive standards govern service of a motion, see Fed. R. Civ. P. 5, rule 4's more rigorous provisions govern service of a summons and complaint initiating a case, see Fed. R. Civ. P. 4.  For example, the all-important personal jurisdiction issue relating to the Motion to Reopen -- whether Ms. Simmons is actually UTAF's attorney and thus can be served on its behalf -- become irrelevant in the context of serving process initiating a new case.   Compare Fed. R. Civ. P. 5(b)(1) (allowing service on a party's attorney) with Fed. R. Civ. P. 4(e)-(j) (making no provision for service on an attorney).   A summons must be served pursuant to rule 4(h) -- in the case of NMDOL filing suit against UTAF -- or rule 4(j)(2) -- in the case of UTAF filing a suit against NMDOL.   Additionally, there are factual questions that should be fleshed out by the parties, should NMDOL continue to be unable to personally serve Morentes, UTAF's chairman.   These questions include: (i) whether serving Morentes' wife or mailing a copy of the process to Morentes' address suffices as a substitute for personal service on Morentes under rule 4(h), see Fed. R. Civ. P. 4(h); (ii) whether Morentes' wife is herself a suitable recipient of service on UTAF's behalf, see Tr. at 43:15-19 (Branch)("Alicia Morentes . . . is also involved in the running of the organization, in fact I've seen her described as . . . director in various [w]eb sites that the organization has."); and (iii) whether any individual other than Morentes and his wife are suitable recipients of service of process.

**IT IS ORDERED** that the New Mexico Department of Labor's Motion to Reopen Matter and Amend Stipulation and Agreement of Compromise and Settlement, filed March 21,

2013 (Doc. 105), is denied, and the Motion to Dismiss Putative Motion to Amend/Correct

Settlement Agreement by New Mexico Department of Workforce Solutions, Doc. No. 105, filed

April 10, 2013 (Doc. 108), is denied as moot.  The Court will leave the final judgment and all

other orders entered in the case intact.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Nancy L. Simmons
The Law Offices of Nancy L. Simmons, P.C.
Albuquerque, New Mexico

   *Attorney entering special appearance for Plaintiff Union de Trabajadores Agricolas
        Fronterizos*

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

--and--

Marshall J. Ray
Richard L. Branch
Tami L. Keating
Constance L. Reischman
New Mexico Department of Workforce Solutions Office of General Counsel
Albuquerque, New Mexico

   *Attorneys for the Defendant*